Argued and submitted September 17, 1984, reversed on appeal, affirmed on cross-appeal March 20, reconsideration denied May 10, petition for review allowed June 4, 1985 (299 Or 251)

STATE ex rel ECKLES,
dba Riverview Marina,
*Respondent - Cross-Appellant,*

*v.*

LIVERMORE et al,
*Appellants - Cross-Respondents.*

(16-83-00926; CA A28776)

696 P2d 1153

James E. Mountain, Jr., Solicitor General, argued the cause for appellants-cross-respondents. With him on the briefs were Dave Frohnmayer, Attorney General, William F. Gary, Deputy Attorney General, and Richard D. Wasserman, Assistant Attorney General, Salem.

Robert Mix, Corvallis, argued the cause and filed the brief for respondent-cross-appellant.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

In this *quo warranto* proceeding, plaintiff sought a judgment that SAIF Corporation, of which defendants are the directors, does not exist validly, because the legislature created the corporation by special legislation in violation of Article XI, section 2, of the Oregon Constitution. Ancillary to that relief, plaintiff asked that SAIF Corporation be declared a mutual insurance company whose assets belong to insured employers (including plaintiff) and requested that a receiver be appointed to wind up its affairs and to distribute its assets to its insureds. He also sought attorney fees. The trial court held that the legislation creating SAIF Corporation, Or Laws 1979, ch 829, is unconstitutional, enjoined defendants from "acting unlawfully as purported directors of a legally non-existent entity" and authorized an award of attorney fees to plaintiff. It denied plaintiff the other relief that he requested, but ordered that SAIF Corporation revert to the "same status as said Fund was immediately prior to the enactment, approval and filing of chapter 829 Oregon Laws 1979 * * *."

Defendants appeal, assigning error to the court's conclusion that the act is unconstitutional and to the award of attorney fees. Plaintiff cross-appeals, assigning error to the court's failure to grant all of the relief sought. Because we conclude that Or Laws 1979, ch 829, does not violate Article XI, section 2, we reverse on that issue on the appeal and affirm on the cross-appeal.

The Oregon Supreme Court recently summarized the history of the Oregon workers' compensation system in *Frohnmayer v. SAIF,* 294 Or 570, 573, 578, 660 P2d 1061 (1983):

"The Oregon workers' compensation system dates from 1913, when the [State] Industrial Accident Fund *[sic]* (SIAC) was created. Or Laws 1913, ch 112, § 20. Until 1965, SIAC was the sole provider of workers' compensation insurance to Oregon employers. The 1965 legislative assembly abolished the state monopoly on workers' compensation and gave Oregon employers the option of qualifying as a 'direct responsibility employer' by proof of 'sufficient financial ability to be able to make certain the prompt payment of all compensation * * * and * * * assessments' by filing a workers' compensation insurance policy issued by a qualified insurer or depositing money, a surety bond or securities in an amount 'sufficient to

insure payment of compensation and assessments,' but not less than $100,000; or insuring as a 'contributing employer' with the State Accident Insurance Fund, the successor to SIAC. Or Laws 1965, ch 285, §§ 5, 75. Since 1965, SAIF and SAIF Corporation have been Oregon's largest providers of workers' compensation insurance.

"* * * * *

"* * * The State Compensation Department (which later became SAIF) had been created in 1965 'for the purpose of transacting workers' compensation insurance business formerly transacted by the State Industrial Accident Commission.' ORS 656.752(1), 1977 Replacement Part; see Or Laws 1965, ch 285, § 55. By passing Oregon Laws 1979, chapter 829, § 5, the legislature created a new entity, the State Accident Insurance Fund *Corporation,* an 'independent public corporation,' whose stated function and purpose was identical to that of the former SAIF—'for the purpose of transacting workers' compensation insurance business formerly transacted by the State Industrial Accident Commission.' (Emphasis in original.)

"The 1979 law made few changes in the method of operation. It provided for a board of directors 'to establish the policies for the operation of [SAIF Corporation] consistent with all applicable provisions of law.' Or Laws 1979, ch 829, § 2(7). The SAIF Corporation's manager, formerly appointed by the governor, was to be appointed by the board. *Id.* § 6. With one exception, which is discussed below, these are the only significant changes resulting from the 1979 legislation."

The court went on to hold that SAIF Corporation, like other entities subject to ORS chapter 180, could not employ independent counsel to handle its legal affairs without the authorization of the Attorney General. 294 Or at 582-83.

Plaintiff argues that, if SAIF Corporation is classified as a corporation of any kind, Article XI, section 2, prohibits its creation by a special law and that chapter 829 is a special law. He relies primarily on the fact that the legislature's express intention in enacting Or Laws 1979, ch 829, was to create an "independent public corporation" and points to various attributes of SAIF Corporation that are not shared by other state agencies and which, he concludes, demonstrate that SAIF Corporation is, in fact, a prohibited corporation. Although the legislature chose to characterize the new entity

as a corporation, that fact alone is not dispositive. Denominating an entity a corporation does not, as plaintiff suggests, make it a corporation subject to section 2; the question whether SAIF Corporation is such a corporation must be determined by what the entity is, not by what it is named. Similarly, we reject defendants' suggestion that if SAIF Corporation is a "state agency," then Article XI, section 2, has no further application because, even if SAIF Corporation is a state agency in the relevant sense,[1] the question remains whether the legislature may create, consistent with the constitution, an agency having the characteristics of SAIF Corporation.

It may be true that SAIF Corporation has some attributes generally considered necessary for corporate existence. *See generally* Fletcher, *Cyclopedia Corporations* §§ 5, 58 (permanent ed 1974).[2] However, SAIF Corporation is not a corporation in the "ordinary sense of the word,"[3] any more than were its predecessors, *see Butterfield v. State Indus. Acc. Com., supra,* n 2, and an examination of the history of section 2 demonstrates that it was not intended to prohibit the

---

[1] In this regard, we have in mind the fact that the state must always act through an agent of some kind. *See United Contracting Co. v. Duby,* 134 Or 1, 28, 292 P 309 (1930).

[2] SAIF Corporation may sue and be sued in its own name as a legal entity distinct from the state. ORS 656.752(3) (*amended by* Or Laws 1979, ch 829, § 5a); *cf. Butterfield v. State Indus. Acc. Com.,* 111 Or 149, 158, 223 P 941, 226 P 216 (1924) (State Industrial Accident Commission held to be a corporate entity for purpose of permitting an action against it). It may exercise the rights of ownership over property in its own name. ORS 656.752(5) (*amended by* Or Laws 1979, ch 829, § 5a); *cf. Liggett v. Ladd,* 23 Or 36, 45, 31 P 81 (1892); *Dunn v. State University,* 9 Or 357, 361 (1881) (power to transmit property to successors in office in perpetual succession and without intermediate conveyances held sufficient to make board of regents of state college a corporate entity for purpose of suit challenging conveyances thereto). Chapter 829 does not specify any period of existence for SAIF Corporation, perpetual or otherwise. That omission should be compared to the legislature's specific authorization for such entities as people's utility districts, ORS 261.305(1), mass transit districts, ORS 267.200(1), and metropolitan service districts, ORS 268.300(1) to provide for perpetual succession. The legislature may abolish SAIF Corporation at any time.

[3] Some confusion results from the fact that entities with widely disparate characteristics are all deemed "corporations," *see generally* Fletcher, *Cyclopedia Corporations, infra,* ch 3, at 278-385, and from the fact that the same entity may be considered a corporation for some purposes, but not for others. For example, in *Butterfield v. State Indus. Acc. Com., supra,* n 2, the State Industrial Accident Commission was held to be a corporation for purposes of permitting an action to be maintained against it, but in *In re C.O. Pick Co.,* 9 F2d 207 (D Or 1925), the commission was held not to be a corporation for purposes of receiving priority in federal bankruptcy proceedings.

creation of entities that have the characteristics and functions of SAIF Corporation.

Article XI, section 2, of the Oregon Constitution provides, in pertinent part:

> "Corporations may be formed under general laws but shall not be created by the legislative assembly by special law * * *."

As it originally appeared in the Oregon Constitution of 1859, section 2 provided:

> "Corporations may be formed under general laws, but shall not be created by special laws, *except for municipal purposes;* all laws passed pursuant to this section, may be altered, amended, or repealed but not so as to impair, or destroy any vested corporate rights." (Emphasis supplied.)

Apparently, the first sentence of the original section was taken from Article XV, section 1, of the Michigan Constitution of 1850. *See* Palmer, *Sources of the Oregon Constitution,* 26 Or L Rev 200, 211 (1926). The Michigan Constitution no longer contains that provision; however, during the time that it did, the Michigan Supreme Court explained in *Nelson v. McArthur,* 38 Mich 204, 207 (1878):

> "The great purpose of the provision was to introduce a system of legislation in regard to the institution of corporations which would exclude the corruption and party favoritism which had too often accompanied the method previously in vogue, and to secure as far as practicable for all people of the State an equality of opportunity and a guard against sectional discriminations. * * *
>
> "* * * * *
>
> "When the provision in question was adopted, the system of direct and immediate incorporation of particular individuals by legislative charter, or in other words, the creation of corporations by special act, was generally condemned as impolitic, and those holding this opinion contended that corporations should be organized under common regulations which would permit any group of persons wishing to do so to effect incorporation without special application or special favor, and would exclude sectional distinctions and local immunities and local jealousies * * *."

That sentiment echoed what the Oregon court said in *Oregon Cascade R.R. Co. v. Baily,* 3 Or 164, 172 (1869):

"Formerly, corporations were formed by a direct grant from the sovereign power. The instrument in which the grant was expressed was called a charter, and it was the practice in most of the states of the Union, until recently, for the legislature to grant charters. Each corporation was created by a special act of the legislature.

"This practice conferred special favors, and was thought to have a bad influence upon legislation. When our constitution was formed, it was provided that no corporation should be created by special act of the legislature. * * *

"The word corporation is here [in Article XI, section 2] used to denote such ideal bodies as had formerly been created under that name by charter or by special legislative acts; and that meaning must be given to the word corporation in construing the general law that provides the mode of forming corporations."

The rationale for this limitation on the legislature was explained by the United States Supreme Court in *Oregon Railway and Navigation Co. v. Oregonian Railway Co.,* 130 US 1, 20, 9 S Ct 409, 32 L Ed 837 (1889):

"[W]hile valuable services have been rendered the public by this class of organizations, which have stimulated their formation by numerous special Acts, it came at last to be perceived that they were attended by many evils in their operation as well as much good, and that the hasty manner in which they were created by the legislature, sometimes with exclusive privileges, often without due consideration and under the influence of improper motives, frequently led to bad results.

"Whether it was this consideration, or mainly the desire to fix some more uniform rule by which the rights and powers of *private corporations or those for pecuniary profit,* should come into existence, it is certain that not many years ago, State Constitutions which were formed or remodeled came to have in them a provision like that which is now to be found in the Constitution of the State of Oregon, art. XI, § 2. * * *" (Emphasis supplied.)

The original section 2 did not prohibit the creation of corporations for municipal purposes by special laws. *In Cook v. Port of Portland,* 20 Or 580, 27 P 263 (1891), the distinction was drawn between *private* corporations prohibited by section

2 and governmental instrumentalities, which were not prohibited:

> "The purposes and powers of the port of Portland are all public, political or governmental. It possesses none of the features of a *private corporation.* There is no stock to be subscribed. Its members are citizens, not stockholders. There is no acceptance necessary, and its powers and very existence are at the will of the legislature. * * *
>
> "* * * These municipal corporations or divisions exist only for the convenient administration of the government. Such organizations are instruments of the state to carry out its will. * * *" 20 Or at 587. (Emphasis supplied.)

In 1906, an amendment to section 2 and a new Article IV, section 1a, were adopted by the voters. The amended section 2 provided:

> "Corporations may be formed under general laws, but shall not be created by the legislative assembly by special laws. The legislative assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town. The legal voters of every city and town are hereby granted power to enact and amend the municipal charter, subject to the constitution and criminal laws of the State of Oregon."

The purpose of the 1906 amendment was to eliminate the legislature's power to make a charter for a city or town by special law, *Rose v. Port of Portland,* 82 Or 541, 561, 162 P 498 (1917); *see also LaGrande/Astoria v. PERB,* 281 Or 137, 144-45, 576 P2d 1204, *aff'd on reh* 284 Or 173, 586 P2d 765 (1978), and to establish "Home Rule" in Oregon. *See State ex rel v. Port of Tillamook,* 62 Or 332, 340-41, 124 P 637 (1912).

The following year, the legislative assembly enacted legislation, patterned after the act creating the Port of Portland and upheld in *Cook v. The Port of Portland, supra,* establishing and creating the Port of Columbia. In *Farrell v. Port of Columbia,* 50 Or 169, 91 P 546, *aff'd on reh* 50 Or 175, 93 P 254 (1907), the court held that the legislature had exceeded its authority under the new section 2. Relying on *Cook* for the proposition that the Port of Columbia was a corporation created for municipal purposes, the court concluded that the legislation creating the port was a "special law" and was, therefore, unconstitutional:

"By this [1906] amendment the power to create corporations by special act was not only eliminated, but the creation of a corporation by such an act is expressly prohibited, and it is no longer in the power of the legislative authority to create a corporation *public or private* by a special law. * * *" 50 Or 171. (Emphasis supplied.)

The same statement was made in *Straw v. Harris,* 54 Or 424, 103 P 777 (1909), when the court was considering whether "the port of Coos Bay, being a municipal corporation, comes within the purview of Section 2, Article XI, Constitution of Oregon." 54 Or at 430. The court concluded that the 1906 amendment had not changed the meaning of the term "corporation" from what it had meant in the original section 2, where it was "employed in its broadest sense, including therein public, municipal, and private corporations * * *." 54 Or at 430.

Plaintiff argues that the port cases establish that section 2 prohibits the creation of SAIF Corporation. We think it clear that they do not. The language contained in *Farrell* and *Straw,* in particular, where the expansive interpretation of section 2 urged by plaintiff finds its expression *in dicta,* must be understood in context; *Cook, Rose, Farrell* and *Straw,* read together, stand for the proposition that the legislature's authority to create corporations for municipal purposes by special laws was revoked by the 1906 amendments, and that the ports there in issue were corporations created for municipal purposes. Thus the concept of "Home Rule" forbade their creation by special law.

SAIF Corporation is neither a private corporation nor a corporation created for a municipal purpose; it is *sui generis,* and if it violates Article XI, section 2, it must be for some reason other than its quasi-corporate character. *See generally Reilley v. Secretary of State,* 288 Or 573, 577, 607 P2d 162 (1980). However, we discern no reason why we should construe that provision to prohibit the legislature from clothing a state instrumentality that it creates with some corporate attributes when that entity is created for a statewide, not municipal, public purpose and is subject to public management and control.[4] SAIF Corporation is such an

---

[4] Most state courts that have specifically considered the question hold that the prohibition on the creation of corporations by special laws does not apply to the

entity; it does not infringe on the powers of any municipality, city or town in contravention of the "Home Rule" Amendment of 1906.

The legislature's authority to supplant common law remedies with a statutory insurance system to compensate workers for employment related injuries, and to create an entity to implement that system, has been long established. *Evanhoff v. State Industrial Acc. Com.*, 78 Or 503, 154 P 106 (1915); *see also Butterfield v. State Indus. Acc. Com.*, *supra*, n 2. Because SAIF Corporation's purpose is to "transact the Workers' Compensation Insurance business formerly transacted by State Industrial Accident Commission," and because the creation of SIAC was held in *Evanhoff* to have been within the police power of the state, it is clear that SAIF Corporation

---

creation of public corporations for public purposes. *See State Bar v. Superior Court*, 207 Cal 323, 278 P 432 (1929); *Napa State Hospital v. Dasso*, 153 Cal 698, 96 P 355 (1908); *Idaho Water Resources Board v. Kramer*, 97 Idaho 535, 548 P2d 35 (1976); *Board of County Com'rs v. Idaho Health Fac. Auth.*, 96 Idaho 498, 531 P2d 588 (1975); *People v. Green*, 382 Ill 577, 47 NE2d 465 (1943); *Orbison v. Welsh*, 242 Indiana 385, 179 NE2d 727 (1962); *In Re Advisory Opinion*, 380 Mich 554, 158 NW2d 416 (1968); *State v. Bates*, 317 Mo 696, 296 SW 418, 419 (1927); *In Re Scott*, 53 Nev 24, 292 P 291 (1930); *In Re Gibson*, 35 NM 550, 4 P2d 643 (1931); *Webb v. Port Commission of Morehead City*, 205 NC 663, 172 SE 377 (1934); *Kelley v. Earle*, 325 Pa 337, 190 A 140 (1937); *State v. McCaw*, 77 SC 351, 58 SE 145 (1907); *West v. Tennessee Hous. Dev. Agency*, 512 SW2d 275 (Tenn 1974); *State ex rel W Va Housing Dev. Fund v. Copenhaver*, 153 W Va 636, 171 SE2d 545 (1969).

The only jurisdiction we have found that unequivocally applies its constitutional provision to both public and private corporations is Arizona. In *Fireman's Fund Ins. Co. v. Arizona Ins. Guar. Assn.*, 112 Ariz 7, 536 P2d 695 (1975), the Arizona Supreme Court held that legislation creating the Arizona Insurance Guaranty Association, a public corporation created to carry out a mandate of the legislature, was unconstitutional, because the court could find nothing in the Arizona Constitution to support the idea that the constitutional prohibition on the creation of corporations by special act does not apply to public corporations. However, the Arizona court noted:

"We of course do not question the authority of the legislature to create boards, commissions, departments, and agencies to carry out public purposes. Our statutes are replete with a variety of governmental agencies with wide differences in their organizational structures and functions. In each instance the agency is 'governed and controlled by public officials.' " 112 Ariz at 9. (Citation omitted.)

*See also Bridegroom v. State Bar*, 27 Ariz App 47, 550 P2d 1098 (1976) (act creating Arizona State Bar Association held unconstitutional as creating a public corporation by a special act); *Whitter v. Baumgartner*, 180 Neb 446, 144 NW2d 62 (1966) (act creating a public corporation for a public purpose held unconstitutional as creating a corporation by a special act), overruled in *State ex rel Douglas v. Neb. Mortgage Finance*, 204 Neb 445, 283 NW2d 12 (1979) (act in question held not to be a special act).

was created for a valid public purpose and is an instrumentality of the state. For example, SAIF Corporation is liable for compensable claims validly asserted against its predecessor SIAC, *Fossum v. SAIF,* 293 Or 252, 646 P2d 1337 (1982), must accept compensable claims from injured workers employed by noncomplying employers, ORS 656.054 as amended by Or Laws 1979, ch 839, § 2, and may not employ independent counsel to conduct its legal affairs without the authorization of the attorney general under ORS chapter 180. *Frohnmayer v. SAIF, supra,* 294 Or at 582-83.

SAIF Corporation is also subject to public management and control and was given limited corporate attributes for one purpose and one purpose only—to enable it to carry out its function of transacting the workers' compensation insurance business formerly transacted by SIAC. *See generally* Or Laws 1979, ch 829, §§ 4, 5(a). Not only is that duty mandated by statute, but the manner of its execution is also mandated by statute in large degree. No private party, not even its insureds, has the right or power to alter, diminish or enlarge upon SAIF Corporation's statutory duties or the manner in which those duties may be accomplished.

The degree of public control over the management and control of SAIF Corporation extends beyond the fact that it was created for a particular public purpose with powers limited to the accomplishment of that purpose. For example, section 2 of the act provides that the members of the board of directors be appointed by, and serve at the pleasure of, the governor, subject to confirmation by the Senate. The number of board members is fixed by law, together with a requirement designed to ensure that divergent views, including those of the public, will be represented on the board. Board members may not have a pecuniary interest in the workers' compensation insurance industry, and compensation for their services is limited to a per diem and expenses, the same compensation members of state boards and commissions receive. *See* ORS 292.495. The board is required to meet at least four times annually and must file an annual report with both the legislature and the governor. Although the board's function is to "establish the policies for the operations of the State Accident Industrial Fund Corporation," section 2 of the act requires those policies to be "consistent with all applicable provisions

of law." Although the board has authority under section 6 of the act to appoint a manager to carry out the functions of the corporation, the manager is subject to the board's direction and serves at its pleasure, and the board serves at the governor's pleasure. Furthermore, the ultimate control over its function and its existence lies with the legislature.

It is clear that the entity created by chapter 829 is subject to public control in the exercise of the powers granted to it by the legislature and that those powers were granted solely to enable it to carry out its duties under a legislative scheme intended to serve a valid statewide public purpose. Characterizing it as a corporation and giving it some of the attributes of a corporation do not affect the result. Because Article XI, section 2, does not prohibit the legislative assembly from creating an entity with some corporate attributes for a statewide public purpose and subject to public management and control, Or Laws 1979, ch 829, is not unconstitutional.

■■ The only remaining question that requires discussion is whether plaintiff was entitled to an award of attorney fees. This action was brought pursuant to ORS 30.510 to 30.640. *See* ORS 34.810. Those statutes do not authorize an award of attorney fees, and there is no claim of contractual authorization here. Attorney fees are not generally allowed without one or the other. *Cook v. Employment Division,* 293 Or 398, 649 P2d 594 (1982). Plaintiff contends that he is entitled to an award of attorney fees,[5] because he brought this action in the capacity of a private attorney general. No Oregon case supports an award of attorney fees solely on that basis, although they have been awarded to the prevailing party in proceedings that were equitable in nature and benefitted members of the public. *Deras v. Myers,* 272 Or 47, 535 P2d 541 (1975); *Umrein*

---

[5] Plaintiff's complaint prayed for judgment, in part, as follows:

"X

"* * * * *

"4. Appointing a receiver to wind up the affairs of SAIF under the following instructions:

"* * * * *

"(5) To pay reasonable attorney fees and costs for this proceeding."

SAIF is not a party to this proceeding. The trial court, apparently *sua sponte,* authorized an award of attorney fees against the defendants.

*v. Heimbigner,* 53 Or App 871, 632 P2d 1367 (1981). Given our disposition of the case, plaintiff is not the prevailing party. Accordingly, even though a court might otherwise have discretion to award him fees, he is not entitled to them in either this court or the trial court.

Reversed on appeal; affirmed on cross-appeal.