Argued and submitted July 9, 1985, reassigned February 7, decision of Court of
Appeals affirmed October 7, 1986

**STATE ex rel ECKLES,**
dba Riverview Marina,
*Petitioner on Review,*

*v.*

**WOOLLEY et al,**
*Respondents on Review.*

(TC 16-83-00926; CA A28776; SC S31738)

726 P2d 918

Robert Mix, Corvallis, argued the cause and filed the petition for petitioner on review.

Dave Frohnmayer, Attorney General, Salem, argued the cause for respondents on review.

LINDE, J.

## LINDE, J.

In 1979, the Legislative Assembly replaced the previous State Accident Insurance Fund with a new State Accident Insurance Fund Corporation (SAIF Corporation). Or Laws 1979, ch 829. Petitioner, the sole proprietor of an Oregon business insured for workers' compensation coverage with SAIF Corporation, asserts that the statute contravenes the constitutional mandate that "[c]orporations may be formed under general laws, but shall not be created by the Legislative Assembly by special laws." Or Const, Art XI, § 2. Petitioner brought this action pursuant to ORS 30.510(3) against the directors of SAIF Corporation, seeking a judgment that SAIF Corporation is "a nullity and non-existent" and further relief consequent thereon.[1] The circuit court entered a judgment declaring that Oregon Laws 1979, chapter 829, did unconstitutionally create SAIF Corporation by a special law and ordered that SAIF return to the form it had prior to the enactment of that statute. The court stayed its judgment for 180 days and retained jurisdiction over the remaining issues of consequential relief. The Court of Appeals reversed, holding that SAIF Corporation is neither a private corporation nor a municipal corporation and not within the constitutional prohibition. 72 Or App 650, 696 P2d 1153 (1985). We affirm the decision of the Court of Appeals.

Because the legislature undeniably reorganized the State Accident Insurance Fund as a "corporation" by a law which named the corporation and under which no other corporation can be formed, our conclusion requires an historical explanation.

1. *The Constitutional Background*

Article XI, section 2, of the Oregon Constitution originally provided:

---

[1] ORS 30.510 provides:

"An action at law may be maintained in the name of the state, upon the information of the district attorney, or upon the relation of a private party against the person offending, in the following cases:

"* * * * *

"(3) When any association or number of persons acts within this state, as a corporation, without being duly incorporated."

Actions under this subsection may be commenced by the district attorney of the district where the action is triable or by a private person who is "deemed a coplaintiff with the state." ORS 30.610.

"Corporations may be formed under general laws, but shall not be created by special laws, except for municipal purposes; all laws passed, pursuant to this section, may be altered, amended, or repealed, but not so as to impair, or destroy any vested corporate rights."

The 19th century drafters of the constitution knew "corporations" as institutions for conducting public and communal as well as charitable and educational affairs and also as a legal form for conducting gainful private enterprises, a form that the English and American governments at first created by special charters but later made available by general incorporation laws to replace the earlier joint stock companies.[2]

Other sections of Article XI further show the convention's understanding of its distinction in section 2 between the kind of corporations that could "be formed under general laws" and corporations that could be specially created "for municipal purposes." Section 3 limited the liability of "stockholders of all corporations, and joint stock companies" to the amount of their stock subscriptions. Here "all corporations" plainly meant only business corporations, the kind that had stockholders. Section 4 then and now prescribes that "corporations" may not take property under authority of law (by eminent domain) without compensation being first made or secured. This "authority of law" could be and was extended both to municipal corporations and to business enterprises such as railroad or utility companies. Section 5 refers to legislative acts "incorporating towns, and cities." Section 6 forbids the state to "subscribe to, or be interested in the stock of any company, association, or corporation," again presupposing the kind that issues shares of stock ownership. Section 8 forbids the state to "assume the debts of any county, town, or other corporation whatever" (except debts incurred in

---

[2] *See* Ballantine, Ballantine on Corporations 32-38, §§ 8-9 (rev ed 1946) (and sources cited therein at 32 n 3, 37 n 19); Williston, *History of the Law of Business Corporations Before 1800,* 2 Harv L Rev 105, 149 (1888). Early Oregon statutes referred to "private" corporations (conducted for the stockholders' profit), *see* General Laws of Oregon, ch 7, title I, pp 524-29 (Misc Laws)(Deady & Lane 1843-72), incorporated religious or charitable entities, *id.* ch 3, §§ 1-17, pp 498-501, and "corporate" government bodies such as school districts, *id.* ch 4, title IV, § 40, p 510. The term "public corporation" was used as a generic term in statutes concerning legal actions or execution against counties, cities, towns, school districts or "other public corporation of like character." *Id.* ch 4, title IV, § 346, p 182.

defending the state), a phrase mingling units of local government and "other" corporations. Finally, section 9 prohibits any "county, city, town, or other municipal corporation" to "become a stockholder in any joint stock company, corporation, or association whatever" or to "raise money for" or "loan its credit to" any such entity. In this section, the governmental "corporation" is squarely juxtaposed to the corporation as a vehicle for private investment.

Perhaps one should not make too much of the diverse uses of the term "corporation" in Article XI. Only sections 1 and 9 were original; the remaining sections were taken from the constitutions of several other states. Nonetheless, it is apparent that the convention used the term both for municipalities ("incorporated" towns and cities) and for private business corporations.

Section 2, the section at issue here, was based on Article XV, section 1, of the Michigan Constitution of 1850. Its object was to eliminate corruption, favoritism, and sectional discrimination in incorporating individual private companies and to open equal opportunities for entrepreneurs to form business corporations with limited liability and ownership of property by successive shareholders. *See Nelson v. McArthur,* 38 Mich 204, 207-08 (1878).[3] Interpreting this

---

[3] Judge Upton in 1869 similarly instructed a jury on the meaning of Article XI, section 2, of the Oregon Constitution in *Oregon Cascade R.R. Co. v. Baily,* 3 Or 164, 172-73 (1869).

The political origins of the widespread restrictions on chartering individual business corporations and particularly banks are summarized in Schlesinger, The Age of Jackson 334-39 (1945). Objection to special granted privileges also finds expression in the constitutional prohibition against laws "granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens." Or Const, Art I, § 20. The relationship between restrictions on special granted privileges generally and special grants of corporate privilege is shown in Tennessee's constitution. The 1834 constitution provided:

> "The Legislature shall have no power to suspend any general law for the benefit of any particular individual, nor to pass any law for the benefit of individuals inconsistent with the general laws of the land; nor to pass any law granting to any individual or individuals, rights, privileges, immunities, or exemptions, other than such as may be, by the same law, extended to any member of the community, who may be able to bring himself within the provisions of such law: *Provided always,* the Legislature shall have power to grant such charters of corporation as they may deem expedient for the public good." (Emphasis in original.)

Tenn Const of 1834, Art XI, § 7. A provision requiring general rather than special corporation laws was added to this section in the 1870 constitution.

section, the Michigan court held that incorporation of a county agricultural society to purchase and operate a fairground, among other purposes, fell within the "municipal purposes" permitted by the constitution. *Agricultural Society v. Houseman,* 81 Mich 609, 46 NW 15 (1890). Other sections of Michigan's constitution referred to "municipal corporations" and defined the term "corporations" to include "all associations and joint stock companies having any of the powers or privileges of corporations not possessed by individuals or partnerships." Mich Const, Art XV, § 11 (1850).

The phrase "corporations for municipal purposes" that Oregon's Article XI, section 2, excepted from the prohibition against special charters may have been the same as "municipal corporations" in section 9, or the phrase may have extended to private corporations chartered for "municipal purposes."[4] If it included the latter, the exception might have led Oregon's government and courts into extensive debates about the purpose that would allow chartering a private enterprise for "municipal purposes" and whether courts could disqualify any purpose as not properly "municipal." In *Cook v. The Port of Portland,* 20 Or 580, 584, 27 P 263 (1891), the court stated that "municipal purposes" extended beyond the governance of "cities, towns, and villages" in sustaining a law incorporating a specific port district. Before further and perhaps more difficult tests of the phrase arose, however, Article XI, section 2, was amended in 1906 to repeal the

---

[4] Other contemporary constitutions besides Michigan's referred separately to "municipal corporations" and to corporations for "municipal purposes." *See, e.g.,* Cal Const, Art IV, §§ 31, 37 (1849); Ill Const, Art IX, § 5, Art X, § 1 (1848); Wis Const, Art XI, §§ 1, 2 (1848).

Before the constitutional convention, a private enterprise for profit could be incorporated for a public purpose. For instance, three years before the constitutional convention the territorial legislature enacted a "special law" to incorporate the Oregon City Water Company, stating that five named men "and such other persons as may be associated with them, by subscribing to the capital stock of the company [were] * * * constituted and declared a body politic and corporate * * * for the purpose of furnishing the said city with a constant supply of fresh and pure water." The statute made it "the duty of the president and directors" of the company to construct reservoirs, lay pipes, and erect fire hydrants, and it contained detailed provisions governing rates and services. Special Laws of Oregon 1853-1854, pp 78-79.

The obligations accompanying special or exclusive rights to provide some community service, such as ferries or mills, as spelled out in this water company statute, are interestingly traced from the 15th century in Haar & Fessler, The Wrong Side of the Tracks 78-140 (1986).

exception, and it was further amended in 1910. The relevant sentences now provide:

"Corporations may be formed under general laws, but shall not be created by the Legislative Assembly by special laws. The Legislative Assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town. * * *"

Or Const, Art XI, § 2.

### 2. *Agencies as "Quasi-Corporate" Entities*

In a quite different legal context, this court introduced the notion that some unquestionably state-managed programs might, while others might not, have "corporate" status. The Legislative Assembly in 1872 created a "board of directors" to establish the University of Oregon and by an 1876 amendment denominated the board the "Regents of the University." In a suit by creditors of a private association which had conveyed land to the board for a site for the university, *Dunn v. State University,* 9 Or 357 (1881), the regents asserted that they were agents of the state and could not be sued. To the plaintiffs' argument that the board of directors was an incorporated body, the defendants responded by citing the prohibition of Article XI, section 2, against laws creating a corporation "except for municipal purposes." The court noted that the legislature had not declared either the university or the board of directors to be a corporation, but "this was not essential." The court agreed with the plaintiffs that the statutes gave the board powers to receive, hold, and convey property that "could not belong to this board of directors unless incorporated"; therefore, a suit could be brought against the regents. *Id.* at 361. "It is not necessary to decide whether the board of directors * * * is a public or private corporation." *Id.* at 362. Similarly, the Board of Regents of the State Agricultural College was held to be a "corporation * * * capable of taking and holding the title to real property." *Liggett v. Ladd,* 23 Or 26, 45, 31 P 81 (1892).

After the creation of the State Industrial Accident Commission (the original predecessor of SAIF Corporation) in 1913, the commission defended against an appeal of a rejected compensation claim on the grounds that the commission was an arm of the state and could not be sued. *Butterfield v. State Indus. Acc. Com.,* 111 Or 149, 223 P 941, 226 P 216

(1924). The court noted that the legislature had expressly provided that the commission "in its name may sue and be sued," and continued, superfluously, that the commission was given "other powers exercised by a corporation. * * * It is a creature of the legislature and is a body corporate." *Id.* at 153. When a petition for rehearing argued that characterizing the commission as a corporation would make its creation unlawful under Article XI, section 2, the court responded without further explanation that the Workmen's Compensation Act was not a "special act" but a "general statute of the state." *Id.* at 162.

The issues in these early cases were whether boards or commissions created by the legislature were proper parties to litigation or immune as agents of the state, and the court appears to have assumed that the answer involved the "corporate" status of the board or commission, either as a necessary premise or as a necessary consequence of the capacity to sue and be sued. The court had second thoughts about its approach to so characterizing boards when the legislature authorized the Regents of the University to contract for the construction of dormitories to be financed from rental income, and the regents' bond issue for this purpose was challenged as creating an indebtedness of the state contrary to Article XI, section 7, of the constitution.[5] The court now declared the regents to be "not an independent legal entity" but "merely an administrative agency vested by the legislature with certain corporate powers" and any debts incurred by the regents to be an indebtedness of the state. *McClain v. Regents of the University,* 124 Or 629, 633-34, 265 P 412 (1928). Accepting *Dunn's* characterization of the regents as a "corporation," the court called it "not private in character" but a "public corporation." *Id.* at 634. The proposed bonds nevertheless were approved because they were payable from dormitory income only and created no other liability.

Finally, when the State Board of Higher Education, successor to the regents, returned to the court in another

---

[5] Article XI, section 7, of the Oregon Constitution provides:

"The Legislative Assembly shall not lend the credit of the state nor in any manner create any debt or liabilities which shall singly or in the aggregate with previous debts or liabilities exceed the sum of fifty thousand dollars * * *."

dispute over trial procedure, the court's review of the foregoing cases ended by describing the board as "an agency of the state vested with limited corporate powers * * * best described as a public quasi-corporation." *State ex rel Kleinsorge v. Reid,* 221 Or 558, 570, 352 P2d 466 (1960). This echoed an earlier characterization of the State Fish Commission as "a mere agency of the state in the nature of a *quasi*-public corporation created by legislative enactment with certain delegated powers." *Mohler v. Fish Commission,* 129 Or 302, 305, 276 P 691 (1929), *quoted in State ex rel Kleinsorge v. Reid, supra,* 221 Or at 569.

The prefix "quasi" means that a thing is treated as if it were something it resembles but is not. When courts find themselves describing an entity not only as a "quasi-corporation" but as something "in the nature of a quasi-public corporation," the usefulness of a further search for the one true essence of the entity may be doubted. When the question is whether the proper venue in a tort action against board members is where the defendants' act was done or where they maintain their office, as in *State ex rel Kleinsorge v. Reid, supra,* a court may have to decide whether a rule for venue in actions against corporations applies, but this says little about whether the board is a "corporation" within the meaning of some unrelated rule. An advocate sometimes will make a tactical claim in the case at hand without fully considering its implications for the client's status in other legal areas. For the same reason, characterizations in judicial opinions responding to such arguments made in one context are inconclusive on substantially different issues arising in the context of different laws.

### 3. *Public Corporations*

In all of the preceding cases the question was whether an entity created by statute should be characterized as a "corporation" (or analogized as a "quasi-corporation") when the legislature had not done so. In the statute now at issue, the Legislative Assembly expressly chose the form of a "corporation," SAIF Corporation, to manage the workers' compensation insurance coverage previously provided by the State Accident Insurance Fund. Plaintiff contends that we should take the legislature at its word. Defendants respond that SAIF Corporation is not the kind of "corporation" to which Article

XI, section 2, refers but in reality is a state agency, and that even if it is a "corporation," the law creating it was not a "special" but a "general" law.

We need not revive the scholastic debate between nominalism and realism after 700 years to determine whether SAIF Corporation is a corporation in essence or in name only. Nor does characterizing it as a state agency mean that it cannot also be a corporation. The legislature wanted to give the state-managed compensation program numerous features common to insurance companies, and although these features might have been given to a board (like, for instance, the State Board of Higher Education) or to an agency under a single manager (like, for instance, the predecessor State Accident Insurance Fund), the legislature chose to create what it termed an "independent" corporation. The question is whether it is a corporation that Article XI, section 2, forbids the legislature to create by a special law.

We decline the invitation to hold that the statute creating SAIF Corporation by name is not a "special" law because the corporation's services are available throughout the state and to all employers who choose to use them. After the 1906 amendment eliminated the exception of corporations for municipal purposes, the issue whether an act incorporating a single entity is "special" or "general" under Article XI, section 2, arose with respect to public districts like ports. The question led the court into a maze of terminological distinctions between "public," "general," and "local" laws as contrasted with "private" or "special" laws, from which it emerged with the observation that "[i]t is not easy to define the distinction between a general law and one that is special," and the conclusion that a statute creating a specific port district (like that in *Cook v. The Port of Portland, supra,* before the 1906 amendment) is a special law. *Farrell v. Port of Columbia,* 50 Or 169, 172, 91 P 546, 93 P 254 (1907).[6] Rather, we agree with the Court of Appeals that SAIF Corporation

---

[6] The court continued by quoting the New York Court of Appeals:

" '[I]t has been found expedient to leave the matter to a considerable extent open, to be determined upon the special circumstances of each case.' *Ferguson v. Ross,* 126 N.Y. 459, 464 (27 N.E. 954)."

*Farrell v. Port of Columbia,* 50 Or 169, 172, 91 P 546, 93 P 254 (1907).

falls within neither type of corporation to which the restriction of Article XI, section 2, was addressed.

■     As we have said, these types were the corporation as a form for conducting business enterprise with private investment by and for the profit (or loss) of stockholders, and the corporation as a form of organizing municipal authority and services, ordinarily with territorially-defined taxing authority. Municipal corporations at first were individually created by special laws and therefore were excepted from the prohibition of such laws. That exception was repealed in order to substitute local political "home rule," but it remains significant as evidence of the original understanding that incorporation of enterprises for business purposes was something distinct from incorporation of governmental instrumentalities. The distinction, the court wrote in *Cook v. The Port of Portland*, allows the creation of a corporation for a public purpose, "whose members are citizens, not stockholders; an instrument of the government with certain delegated powers, subject to the control of the legislature, and its members officers or agents of the government for the administration or discharge of public duties." 20 Or at 583.

This original understanding remains pertinent to the reach of Article XI, section 2. For municipalities, the home rule movement won the right of local communities to structure their governmental institutions for themselves free from legislative interference or delay, but no such demand could arise with respect to the legislature's choice of a corporate or some other structure for a governmental program going beyond "municipal purposes," in the original words.

It does not matter that a program in most respects corresponds to enterprises, services, or other activities also commonly carried out by nongovernmental entities. Universities and colleges like those in *Dunn* and *Liggett* were early examples. Here SAIF Corporation provides workers' compensation insurance, and the Legislative Assembly has chosen to organize it in a form closely resembling that of insurance companies privately organized under general corporation statutes in Oregon or elsewhere. The concept of a "public corporation" covers a wide variety of institutions in this country as well as abroad. *See generally,* 1 McQuillin, The Law of

Municipal Corporations §§ 2.03 to 2.03(c)(3d ed 1971); Friedman, The Public Corporation (1954). Public corporations are commonly used to operate railroads, airlines, and municipal utilities and also productive enterprises like coal mines, steel mills, oil refineries, and automobile factories where these are in public ownership. Sometimes governments employ ordinary corporations formed under general laws, with all or controlling shares in government ownership, rather than special charters. Congress employed the corporate form for the Reconstruction Finance Corporation, for insuring bank deposits, for various educational and charitable institutions, for loans to farmers, for legal services, and for subsidizing public broadcasting, among others.

The mere fact that a corporation serves as an instrumentality for a governmental objective does not place it beyond Article XI, section 2. Such a claim could be made for any utility company, bank, or other financial or producing nterprise chartered as the state's "chosen instrument," a practice that the constitutional restrictions were meant to prevent. There are many examples of corporations individually chartered by Congress in pursuit of some public policy and mixing public and private investment and management, from the earliest, controversial creation of the Bank of the United States to contemporary entities like COMSAT and AMTRAK, that would be questionable models under Oregon's constitution.[7]

---

[7] The question whether Congress could incorporate instrumentalities like the Bank of the United States, furnishing 20 percent of its capital and five of 25 directors, was a famous early dispute between Secretary of State Thomas Jefferson and Secretary of the Treasury Alexander Hamilton, eventually decided in favor of congressional power in *McCulloch v. Maryland,* 17 US (4 Wheat) 316, 4 L Ed 579 (1819).

The Communications Satellite Corporation (COMSAT), created in 1962, is owned by communications common carriers and other private shareholders; the President of the United States appoints three of its 15 directors. 47 USC §§ 732-757 (1982).

AMTRAK was created by Congress in 1970 and reconstituted in 1978 as a corporation for profit receiving federal financing but explicitly stated not to be an agency or establishment of the United States Government. 45 USC §§ 501, 541 (1982). Shares are held by private investors and, on behalf of the government, by the Secretary of Transportation. 45 USC § 544(c) (1982). AMTRAK's board of directors includes the Secretary of Transportation, three other presidential appointees, two members selected by commuter rail authorities, and two selected by the preferred shareholders.

■ SAIF Corporation, however, does not have the questionable characteristics of mixed private and governmental investment or management. It has no stockholders, and its board of directors is appointed by the governor, subject to confirmation by the Senate, and serves at the governor's pleasure. ORS 656.751. It meets the tests of a "public" rather than a "private" corporation stated in *Cook v. The Port of Portland, supra,* except that, unlike a localized district, SAIF Corporation cannot meaningfully be described as being "composed of" or having "members" who are citizens. We do not pursue the discussion of the Court of Appeals of the purposes served by SAIF Corporation. There is no need to characterize insurance as a more or less "public" function than transportation, health facilities, housing, the liquor business, gambling, or sports and other entertainment that government chooses to provide with or without using the corporate form. SAIF Corporation's exclusively governmental management and the absence of private investment or objective to operate for private profit suffice to exclude it from the class of corporations to which the prohibition of Article XI, section 2, was addressed.

The decision of the Court of Appeals, reversing the trial court, is affirmed.

---

45 USC § 543 (1982).

The Consolidated Rail Corporation (CONRAIL) similarly is a corporation for profit and declared not to be a government agency. Created to take over rail service in the midwest and northeastern United States from carriers undergoing reorganization, its shares are held in part by these railroads and in part on behalf of the government by another incorporated association, the United States Railway Association, which selects a majority of CONRAIL's board. 45 USC §§ 711, 712, 741 (1982).

Many earlier examples of federally created corporations in various forms are discussed in Schnell, *Federally Owned Corporations and Their Legal Problems* (pts 1 & 2), 14 N C L Rev 238, 337 (1936); Culp, *Creation of Government Corporations by the National Government,* 33 Mich L Rev 473 (1935); Van Dorn, Government Owned Corporations (1926).