Argued and submitted November 28, 1994, reversed and remanded June 7, 1995

David LAINE,
*Appellant,*

*v.*

CITY OF ROCKAWAY BEACH, OREGON,
*Respondent.*

(92-2051; CA A82667)

896 P2d 1219

Per A. Ramfjord argued the cause for appellant. With him on the briefs were Charles F. Hinkle and Stoel Rives Boley Jones & Grey.

Margaret H. Leek Leiberan argued the cause for respondent. With her on the brief were Leiberan & Gazeley, Lois A. Albright and Albright & Kittell.

Before Warren, Presiding Judge, and Edmonds and Landau, Judges.

LANDAU, J.

## LANDAU, J.

Plaintiff initiated this action to compel the City of Rockaway Beach (the city) to disclose documents relating to the operation of the Rockaway Beach Fire Department (the fire department) and generated by the fire department before September 1991. Plaintiff contends that the fire department was, before its incorporation as a private, nonprofit entity in 1991, a "public body" subject to the Oregon Public Records Law, ORS 192.410 *et seq*, and that the city is the custodian of the fire department's records. The city contends that the fire department was a private, volunteer entity, which was not subject to the Public Records Law, and that the city may not be compelled to disclose the requested documents. The trial court found for the city, and plaintiff appeals, assigning error to the trial court's conclusion that the fire department is a private entity not subject to the Public Records Law. We reverse.

The facts do not appear to be in dispute. The city charter of 1942 provides that the city council shall "appoint a fire chief" and that the city council may remove the fire chief it has appointed with or without cause. In 1943, the city appointed the mayor as fire chief and directed him to organize a fire department. The city also approved a plan to take over the Rockaway Rural Fire Protection District that had operated before that time, to acquire the district's equipment, to provide fire protection service to the area previously served by the district, to assume all of the district's liabilities and debts and to indemnify the district for liability for five years. In addition, the city agreed to include in its budget funds sufficient to operate the fire department.

In 1955, the city council passed a motion providing that, in the future, the fire chief would be elected, subject to the "ratification" of the council. It is not clear from the record whether, at least since 1955, the council has exercised its authority to ratify the election of a fire chief. As recently as 1989, however, there is mention in council minutes of the formal acceptance of the resignation of a fire chief. And there is no suggestion in the record that the council has ever abandoned its authority to insist upon ratification.

In 1983, the fire department adopted bylaws for its operations. Under those bylaws, the fire chief

> "shall be the executive officer of the Department and shall be responsible to the Mayor and City Council and City Manager for its proper administration and efficient operation.

> "* * * * *

> "shall diligently observe the condition of apparatus, buildings, tools and equipment, and the status of training and the fire fighting effectiveness in the Department, and render annual reports to the Mayor and the City Council * * *.

> "* * * * *

> "[and] shall have power to prescribe such other public duties or such other line of action, or issue such orders * * * which in his opinion are urgently necessary for the most efficient operation of the Department or the rendering of service to the public."

Since the adoption of the bylaws, the fire chief regularly reported to the city council on a variety of matters, including vehicle maintenance, membership attendance, numbers of emergency calls, training and community activities.

Although the fire department maintained a bank account separate from the city's, the city provided nearly all of the fire department's financial support. It provided the department with its equipment, buildings and money for personnel training. The city owned the firehall and paid for its upkeep. The city also paid for the insurance on the fire trucks and the workers, including workers' compensation insurance. The city paid small monthly salaries to the fire chief, an assistant fire chief and a secretary-treasurer. The city also paid a lump sum to the department to be distributed to the volunteer members as "call pay."

Over the years, the city council enacted ordinances that provide the fire department with specific powers to aid in its fire protection efforts. For example, under City Ordinance No. 29, the fire chief can grant permission for open fires within the city limits. Violation of that ordinance may result in a fine or imprisonment. City Ordinance No. 113 provides that all members of the fire department have the power to arrest persons engaging in disorderly conduct near fires or refusing to "observe promptly an order of a member of the

fire or police department." City Resolution No. 253 gives all fire department officials the power to declare a state of emergency arising out of any hazardous waste accidents. Under that ordinance, the fire department may

> "take all necessary steps authorized by law to secure the persons and property of citizens of the City of Rockaway Beach, including, but not limited to, coordinating the efforts of City departments with regard to mitigation, preparation, response and recovery from [a] hazardous materials incident and requesting aid and assistance from Tillamook County."

In addition, the fire department was granted the authority to enter into agreements in which "City * * * by and through its fire chief" agreed to indemnify and hold harmless the owners of buildings donated to the fire department for burning exercises.

The city also has contracted out the services of the fire department to other areas. For example, in a July 1991 contract, the city agreed to provide fire protection services to Nedonna Rural Fire District of Tillamook County. That contract states that "from time to time the fire chief of the department of City * * * shall * * * visit district" to obtain information necessary to provide fire protection services and that the "City's officer in charge of the fire department or any unit thereof" shall determine what equipment and personnel are required to provide service to the district. A similar agreement was entered into between the city and Neah-kah-nie School District No. 56 of Tillamook County. The city, not the fire department, received direct compensation for providing that service.

In September 1991, the fire department filed articles of incorporation with the Secretary of State, pursuant to the Oregon Nonprofit Corporations Act, and became a public benefit nonprofit corporation, which has since contracted with the city to provide fire protection services.

In October 1991, plaintiff asked the city to allow inspection of records relating to the fire department, including the department's business meeting minutes, equipment maintenance logs, check stubs and treasurer reports. The city denied the request. Following an unsuccessful petition to the district attorney for disclosure, plaintiff initiated this action.

The trial court framed the issue in the following terms:

"As this Court views this case, the issue here is only whether or not the Rockaway Volunteer Fire Department is so connected with the City of Rockaway Beach that it should be considered a part of the City government and because of that close connection be required to comply with public disclosure law."

The trial court then concluded that

"[plaintiff] here has not shown that the Rockaway Beach Volunteer Fire Protection [Department] is or was at the herein critical times relevant to this matter, a public corporation or entity that was so much a part of the City that it was bound to comply with the public disclosure law."

On appeal, plaintiff contends that the trial court erred in concluding that, before 1991, the fire department was not a "public body" subject to the Oregon Public Records Law. The city argues that whether the fire department was a public body is not really the issue. Even if the department was a public body, the city argues, the court could not order the department to disclose any documents, because it is not the defendant in this case; the city is. Accordingly, the city argues, the real issue is whether the trial court correctly determined that the fire department was not an agency of the city, such that the city can be ordered to produce the fire department's documents. The city argues that that determination is one of fact, which we review for substantial evidence. Plaintiff does not respond to that argument.

We conclude that the city correctly frames the issue, but it incorrectly states the applicable standard of review. Because plaintiff has sued the city, and not the fire department, a determination that the fire department was a "public body" within the meaning of ORS 192.410(3) would not, strictly speaking, permit the court to order the fire department to disclose its documents; the fire department is not named as a party to this lawsuit. The real issue is, therefore, as the trial court characterized it: Whether the fire department was so connected to the city to be fairly considered an agency or department of the city government, thus justifying an order compelling the city to disclose the fire department's documents.

Whether the fire department was a part of the city government involves findings of historical fact, *e.g.*, the extent to which the city financed the operations of the department, as well as conclusions concerning the legal significance of those facts, *e.g.*, whether the city had the right to control the department's functions. In this case, the parties do not appear to dispute any issues of historical fact. Accordingly, we review the trial court's decision as a question of law.

We turn to the identification of the test for determining whether the trial court correctly characterized the fire department as a private entity that was not so much a part of the city that the city may be required to disclose the department's documents. Plaintiff argues that the issue is controlled by *Marks v. McKenzie High School Fact-Finding Team*, 319 Or 451, 878 P2d 417 (1994), in which the Supreme Court articulated a six-part test for determining whether an entity is a "public body" within the meaning of ORS 192.410(3). The city contends that *Marks* is inapplicable, because it only concerns whether an entity is a public body under the Oregon Public Records Law. According to the city, the question in this case is whether the fire department was an agency of the city, determined by an examination of the extent to which the department was subject to the city's management and control. The city's sole authority for its proposed "test" is an opinion of the Attorney General on the question of whether the Oregon Medical Insurance Pool is a "state agency." 46 Op Atty Gen 155 (1989).

In *Marks*, the court determined that a "team" of individuals charged by a public school district board with investigating, reporting on and making recommendations concerning the operations of a local high school was not a "public body" within the meaning of ORS 192.410(3). The court held that the determination of whether a particular entity is a "public body"

"will depend on the character of that entity and the nature and attributes of that entity's relationship with government and governmental decisionmaking."

319 Or at 463. The court then identified a list of factors that are relevant to the determination:

"(1)  The entity's origin (*e.g.*, whether the entity was created by government or had some origin independent of government).

"(2)  The nature of the function assigned to and performed by the entity (*e.g.*, whether that function is one traditionally associated with government or is one commonly performed by private entities).

"(3)  The scope of the authority granted to and exercised by the entity (*e.g.*, does the entity have the authority to make binding governmental decisions, or is it limited to making nonbinding recommendations).

"(4)  The nature and level of government financial involvement with the entity. (Financial support may include payment of the entity's members or fees as well as provision of facilities, supplies, and other nonmonetary support.)

"(5)  The nature and scope of government control over the entity's operation.

"(6)  The status of the entity's officers and employees (*e.g.*, whether the officers and employees are government officials or government employees)."

*Id.*

In the 1989 Attorney General's opinion, the issue was similarly phrased as whether the Oregon Medical Insurance Pool (the Pool) was "subject to management and control by persons who are appointed as, or by, state officials." 46 Op Atty Gen at 159. In concluding that the Pool was not a state agency, the Attorney General considered such factors as whether the Pool was "created by statute for a public purpose," whether it was funded by the state, the nature of the Pool's functions and the powers granted to it, and the extent of the state's control over the Pool's operations. *Id.* at 158-59.

The consideration of those factors by the Supreme Court in *Marks* and by the Attorney General, albeit for slightly different purposes, is consistent with a number of cases in which the courts have determined whether an entity is a "state agency" for one purpose or another. For example, in *McClain v. Regents of the University*, 124 Or 629, 265 P

412 (1928), the Supreme Court determined that the University of Oregon could not issue construction bonds without violating the constitutional prohibition on the state incurring indebtedness. Or Const, Art XI, § 7. In concluding that the university was an administrative agency of the state, the court noted that

> "[i]t was created by an act of the legislature in 1876; its regents are appointed by the Governor with the advice and consent of the Senate and their powers and duties are specified by statute. Since its creation, the University has been maintained largely by public funds. Its management and control has never been surrendered by the state."

124 Or at 633.

Similarly, in *State ex rel Eckles v. Livermore*, 72 Or App 650, 696 P2d 1153 (1985), *aff'd sub nom State ex rel Eckles v. Woolley*, 302 Or 37, 726 P2d 918 (1986), we held that SAIF Corporation was not a private corporation formed in violation of the constitutional prohibition on legislative creation of private corporations by special law. Or Const, Art XI, § 2. We noted that the corporation was created by the state for a public purpose, that the appointment of its board was subject to the approval of the state and that the powers and duties of the corporation were subject to legislative determination. 72 Or App at 660-61.

In determining whether the fire department is an agency or department of the city for the purposes of this case, therefore, we evaluate the legal significance of the facts in the light of the foregoing factors, which have been conveniently summarized in *Marks*.

First, we consider the fire department's origins. The department itself was not created by ordinance. The city council, however, did appoint a fire chief — pursuant to the city charter — and direct the fire chief to organize a fire department. Moreover, the department was created shortly after *the city* had entered into an agreement to take over the Rockaway Rural Fire Protection District, assuming that district's liabilities and debts and acquiring that district's equipment and records. Indeed, the district's equipment was promptly turned over to the new fire department. Those facts

weigh in favor of concluding that the fire department was an agency or department of the city.

Second, we consider the fire department's function. The fire department performed a function traditionally associated with government:

> "Firefighting is a service that is uniquely governmental. The need to control, prevent, and fight fires for the common good of the community has been universally accepted as a governmental function and duty in this State and, as far as we can determine, in this Nation, from its very beginning."

*Ayres v. Indian Heights Volunteer Fire Dept.*, 493 NE2d 1229, 1235 (Ind 1986). *See also Wilcox v. Terrytown Fifth D. Volunteer Fire Dept.*, 897 F2d 765, 767 (5th Cir), *cert den* 498 US 900 (1990); *Utica Mut. v. Gaithersburg-Washington Grove*, 53 Md App 589, 596, 455 A2d 987, 993 (1983).

In addition, City Ordinance No. 113 endows all members of the fire department with the power to arrest persons engaging in disorderly conduct near fires. The city's Resolution No. 253 further grants all fire department officials the power to declare a state of emergency under certain circumstances and to take a number of actions pursuant to that declaration. Those policing and general welfare functions are also traditionally associated with city government. *See* ORS 221.315; ORS 221.410. Those facts also weigh in favor of concluding that the fire department was part of the city government.

Third, we consider the fire department's authority. As mentioned, city ordinances provide the fire department personnel with the power to arrest and the power to declare a state of emergency. In addition, City Ordinance No. 29 prohibits open fires within the city limits without the written permission of the chief of the fire department. Violation of that ordinance may result in a fine or imprisonment. More notably, the fire department has the authority to enter into indemnity agreements, which committed the city to indemnify and to hold harmless the owners of buildings donated to the fire department for burning exercises. The city is presumably bound by the determinations made by the fire department in conjunction with those agreements. Those

facts weigh in favor of concluding that the fire department was a part of the city.

Fourth, we consider the city's financial involvement with the fire department. The record shows that the city purchased the fire department's firehall and fire fighting equipment. The city also paid for the fire department's utilities, equipment maintenance, record keeping, personnel training and liability and collision insurance. The city paid monthly compensation to the fire chief, assistant chief, secretary-treasurer and training officer and awarded individual fire fighters compensation based on the number of fire calls made. Although some support came from other sources, the city was the primary provider of financial support. Those facts weigh in favor of concluding that the fire department is a part of the city.

Fifth, we consider the nature and scope of the city's control over the fire department. It is true that the city did not directly control the day-to-day operations of the department. Nevertheless, the city exercised significant control over the department in other ways. For example, it had the authority to approve the election of the fire chief and to remove the chief with or without cause. It also had the authority to define the powers and duties of the fire department, as evidenced by the enactment of a variety of ordinances giving the fire department personnel the authority to arrest disorderly persons, to arrest persons who fail to obey department orders and to declare an emergency under appropriate circumstances and to take action pursuant to such a declaration. The city further had the authority to define the geographic scope of the department's activities, as evidenced by *the city's* agreement to commit the department to provide fire protection services to Nedonna and Neah-kah-nie. The city also had the authority to control the fire department's operating budget. Even the city concedes that, if the city had withdrawn its financial support, the fire department would have ceased to exist.

The fire department's own bylaws appear to recognize the authority of the city to exercise significant control over the department's operations. Those bylaws provided that the fire chief was responsible to the mayor, the city council and the city manager for the proper administration and efficient operation of the department. In accordance with

the bylaws, the chief made monthly reports to the city council concerning everything from membership attendance to the number of emergency calls to vehicle maintenance.

In short, although the city did not exercise complete control over the inner workings of the fire department, it cannot fairly be said, as the city suggests, that the fire department operated completely free of oversight and supervision by the city. We conclude that the facts weigh in favor of concluding that the fire department was part of the city government.

Finally, we consider the status of the fire department's personnel. The chief, the assistant chief and the secretary-treasurer were paid nominal salaries. The fire fighters were volunteers who, although they may receive a small amount of "call pay," remain volunteers. That evidence weighs in favor of concluding that the fire department was not a part of the city.

Weighing together all the foregoing factors, we conclude that the fire department was not, before 1991, a private entity, but was instead a functional agency or department of the city government. The trial court erred in reaching a contrary conclusion. On remand, the trial court shall determine which fire department records are subject to disclosure.

Reversed and remanded.