Argued and submitted May 9, reversed and remanded December 26, 2002

# CITY OF KEIZER,
### a municipal corporation,
*Appellant,*

*v.*

# LAKE LABISH WATER CONTROL DISTRICT,
### a municipal corporation,
*Respondent.*

## 00C-11402; A113784

60 P3d 557

Robert E. Franz, Jr., argued the cause and filed the briefs for appellant.

Laura A. Schroeder argued the cause for respondent. With her on the brief were Justin D. Gericke and Schroeder Law Offices, P.C.

Before Landau, Presiding Judge, and Brewer and Schuman, Judges.

LANDAU, P. J.

426-b

**LANDAU, P. J.**

Plaintiff, the City of Keizer (city), initiated this action for inverse condemnation against defendant, the Lake Labish Water Control District (district), alleging that the district flooded city property, causing damage. The district moved to dismiss on the ground that the law does not permit one governmental entity to bring a claim for inverse condemnation against another governmental entity. The trial court agreed and dismissed the inverse condemnation claim. The city appeals, arguing that it is not precluded as a matter of law from bringing an inverse condemnation claim against the district. We agree and reverse and remand.

The city's complaint alleges the following facts. The district is a water control district formed in accordance with ORS chapter 553. The district owns, operates, and maintains a protective dike and pumping plant for flood protection. The plant is known as the Little Pudding River Watershed Project. The dike itself is known as the Parkersville Dam. The water that accumulates on the west side of the Parkersville Dam is Lake Labish, fed by the Little Pudding River, which naturally flows east toward the dam. The plant is capable of pumping water from Lake Labish into a waterway that spans the east side of the Parkersville Dam and is known as the Big Pudding River.

The city is a municipal corporation located in Marion County. The city owns a park located next to the Labish Ditch, which flows into Lake Labish, and a bridge located across the ditch. The park and the bridge are located within the city's boundaries.

In January and February of 1996, the water level behind the Parkersville Dam rose significantly. The district, however, chose not to pump the water into the Big Pudding River to protect onion fields owned by members of the district located east of the dam. As a result, water west of the dam backed up and flooded the Labish Ditch and the park and damaged the city's bridge.

The following winter, it became apparent that the water level behind the dam once again was going to rise and

that flooding might occur. The city contacted the district and requested that the district pump water into the Big Pudding River. The district decided against doing that, resulting in the flooding of the city's land and the destruction of the bridge.

The city initiated an action for damages and injunctive relief. In its first claim, it alleged that it was entitled to damages for inverse condemnation. The city alleged three different counts within that claim for relief. In Count One, the city alleged entitlement to relief under Article XI, section 4, of the Oregon Constitution. In Count Two, it alleged entitlement to the same relief under ORS 553.090 and ORS 553.270. And, in Count Three, it alleged entitlement to the same relief under Article I, section 18, of the Oregon Constitution.

The district moved to dismiss for failure to state a claim. ORCP 21 A(8). The district argued that, as a matter of law, only a private individual may bring a claim for damages for inverse condemnation. The trial court agreed and entered an ORCP 67 B judgment dismissing the first claim. The city appeals, assigning error to the dismissal of the first claim.

■■ We review the trial court's dismissal for failure to state a claim for errors of law. *Yanney v. Koehler*, 147 Or App 269, 272, 935 P2d 1235, *rev den*, 325 Or 368 (1997). We begin with the statutory basis for the city's claim and then, if necessary, address the claim's constitutional bases. *State v. Nielsen*, 316 Or 611, 618, 853 P2d 256 (1993).

The city contends that it is entitled to bring a claim for inverse condemnation against the district pursuant to ORS 553.090 and ORS 553.270. The former statute authorizes a water control district to condemn real property:

"A water control district formed under the provisions of this chapter shall constitute a governmental subdivision of this state, and a public body, corporate and politic, exercising public power. It shall have full power to carry out the objects of its creation and to that end may:

"* * * * *

"(4) Acquire by condemnation, purchase, devise, gift or voluntary grant real and personal property or any interest

therein, located inside or outside of the boundaries of the district."

ORS 553.090. The latter statute extends that right to property that already is devoted to some other public use:

> "The right to condemn property, given pursuant to ORS 553.090(4) shall include property already devoted to public use, including state and county property, which is less necessary than the use for which it is required by the district. In the acquisition of property or rights by condemnation, the board shall proceed in the name of the district under the provisions of the laws of Oregon."

ORS 553.270.

The city contends that the foregoing statutes at least implicitly authorize actions for inverse condemnation against water districts that acquire property—public or private—without going through the condemnation process. The district responds that merely because a statute authorizes it to condemn property does not mean that an action for inverse condemnation is available whenever it damages property without exercising that statutory authority. According to the district, "inverse condemnation" may be alleged only when property has been taken in violation of constitutional guarantees. We conclude that neither party is entirely correct.

■ The term "inverse condemnation" is one coined by courts to refer to an action for damages asserted against a governmental entity with the power of eminent domain that has taken property without doing so through condemnation proceedings. *Dept. of Transportation v. Hewett Professional Group*, 321 Or 118, 130-31, 895 P2d 755 (1995); *ODOT v. Winters*, 170 Or App 118, 122-23, 10 P3d 961 (2000), *rev den*, 332 Or 239 (2001). It is denominated "inverse" condemnation because the taking occurs before the initiation of condemnation proceedings, which is the inverse of the ordinary sequence of events when a governmental entity exercises its power of eminent domain.

Most commonly, an action for inverse condemnation is based on a violation of the "takings" clauses of either the state or federal constitution. The Oregon Constitution includes two such provisions. Article I, section 18, provides,

"Private property shall not be taken for public use * * * without just compensation." Similarly, Article XI, section 4, provides, "No person's property shall be taken by any corporation under authority of law, without compensation being first made, or secured in such manner as may be prescribed by law." The Fifth Amendment to the United States Constitution likewise provides, in part: "nor shall private property be taken for public use, without just compensation."

■ ■  The underlying theory of an action for inverse condemnation arising under the state or federal constitution is that the constitutional takings provisions are "self-executing" limitations on government authority. *See, e.g., Tomasek v. Oregon Highway Com'n*, 196 Or 120, 143-47, 248 P2d 703 (1952) ("The constitutional right and protection given the owner of property by art. 1, § 18, Oregon Const., supra, is unquestionably self-executing."); *United States v. Clarke*, 445 US 253, 257, 100 S Ct 1127, 63 L Ed 2d 373 (1980) (inverse condemnation claim under the Fifth Amendment derives from " 'the self-executing character of the constitutional provision with respect to compensation' ") (quoting P. Nichols, 6 *Eminent Domain* § 25.41 (3d rev ed 1972)). In other words, because the constitution says that the state must pay for property that it has taken, when the state takes property without paying, the courts may enforce the constitution by requiring the state to pay. As the Oregon Supreme Court explained in *Tomasek*:

> "If there is a taking by the state without compensation being first assessed and tendered, it manifestly would be absurd to attribute to the framers of the constitution an intention that the state might destroy the right and protection given the owner of property and evade the payment of just compensation, simply through the medium of failing or refusing to institute condemnation proceedings."

196 Or at 147.

That said, the Oregon courts have never held that a violation of the state or federal constitution is the only basis for an inverse condemnation claim. To the contrary, the Oregon Supreme Court has said that a claim for inverse condemnation is *not* necessarily exclusively constitutional:

" 'Inverse condemnation' is neither a constitutional nor a statutory term but only the popular description of a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency. Actions to recover compensation for such a governmental taking long preceded the label[.]"

*Suess Builders v. City of Beaverton*, 294 Or 254, 258 n 3, 656 P2d 306 (1982) (citation, internal quotation marks omitted). Thus, the legislature *could* authorize a landowner to seek damages for a governmental taking of property without compensation as, in fact, a number of other state legislatures have done. *See, e.g.*, Ind Code § 32-24-1-16 (1997) ("[a] person having an interest in property that has been or may be acquired for a public use without the procedures of this article [*i.e.*, condemnation]" is entitled to bring an action for damages); Mass Gen Laws Ann, ch 79, § 14 (West 1993) (authorizing action for damages for uncompensated takings); Tenn Code Ann § 29-16-123 (2000) (owner of land "may sue for damages in the ordinary way" for uncompensated takings); Wyo Stat Ann Code § 1-26-516 (Michie 2001) (owner of land may seek damages for uncompensated taking or substantial diminution of value due to actions on adjoining land). The issue in this case is whether the Oregon legislature has done so.

The answer to that question is a matter of statutory construction, governed by the familiar principles set forth in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). We begin with the text of the statute, keeping in mind the goal of ascertaining the legislature's intended meaning of the wording that it enacted into law. *Id.* In that regard, it warrants emphasis that we are constrained by the wording actually enacted and may not insert wording that the legislature has omitted. ORS 174.020.

As we have noted, ORS 553.090(4) authorizes a water district to acquire land by, among other things, condemnation, and ORS 553.270 extends that authority to the condemnation of land that already is in public use. It is undoubtedly correct that, when a water district acquires property by some means other than what ORS 553.090(4) and ORS 553.270

have authorized, the district has violated those statutes. It is well settled that water districts are creatures of statute and can exercise only the authority that the legislature statutorily has conferred on them. *See, e.g., Young et al. v. Gard et al.*, 129 Or 534, 548, 277 P2d 1005 (1929) ("An irrigation district is a creature of the law, its powers are conferred by law and the powers and duties of its officers are defined and limited by the statute."). A conferral of limited authority to such a legislatively created governmental entity always carries with it an implicit command that authority may not be exercised in any other manner. Thus, for example, in *Payette-Ore. Irr. Dist. v. Coughanour*, 162 Or 458, 461, 91 P2d 526 (1939), the Supreme Court explained with respect to a challenge to an irrigation district's assessment authority:

> "The plaintiff irrigation district, a quasi-municipal corporation, is a creature of the statute and possesses only those powers expressly or impliedly granted to it by the legislature. It is also fundamental that the powers thus granted must be exercised in substantial compliance with the mode specified in the statute. *The legislature having prescribed the method and manner of levying assessments, it follows that it must not be exercised in any other manner.*"

(Emphasis added.) Likewise, because the district is a quasi-municipal corporation created by statute, it has only those powers expressly or impliedly granted by statute. ORS 553.090 and ORS 553.270 confer on the district the authority to acquire real property by condemnation. If the district were to acquire property by other means not authorized by the statute, it would violate those statutes.

But it does not necessarily follow that, because the district may have violated the statutes, the proper remedy is an action for damages in inverse condemnation. The legislature said nothing about such a remedy. In fact, the legislature said nothing about remedies at all. Examining the wording of ORS 553.090(4) and ORS 553.270, we find nothing that, when reasonably construed, permits us to conclude that the legislature intended to permit landowners to assert a claim for damages in inverse condemnation based on a water district's acquisition of property without compensation. As we have noted, we are not to construe the statutes in a manner that effectively adds wording that the legislature, by

design or default, has not inserted. ORS 174.020. Moreover, no one in this case has suggested that the courts themselves have recognized, or should now recognize, such a remedy in the exercise of their own common-law authority. *See Scovill v. City of Astoria*, 324 Or 159, 170, 921 P2d 1312 (1996) (when statute imposes a duty but does not specify a remedy for breach of that duty, courts have authority to provide the remedy to further the statute's purpose); *cf. Kruse v. Village of Chagrin Falls, Ohio*, 74 F3d 694, 700 (6th Cir), *cert den*, 519 US 818 (1996) (although city violated eminent domain statute in taking property without compensation, the statute did not authorize an action for damages to remedy the violation). We therefore conclude that the trial court was correct in holding that, as a matter of law, the city cannot assert a claim for inverse condemnation based solely on ORS 553.090(4) and ORS 553.270.

We turn then to the asserted constitutional bases for the city's inverse condemnation claim. The city first relies on Article I, section 18, of the Oregon Constitution, which provides, in part, that "[p]rivate property shall not be taken for public use * * * without just compensation." The district complains that, by its terms, Article I, section 18, applies only to "private" property, not property owned by a public entity such as a city government. The city acknowledges that the constitution refers to "private" property only, but it insists that the provision reasonably could be interpreted to refer to "private" property in the sense that it is not owned by the public entity that has effected the taking.

■ In evaluating the parties' arguments concerning the meaning of this original provision of the Oregon Constitution, we apply the three-component method of analysis described in *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992). We look to the specific wording of the disputed provision, the case law surrounding it, and the historical circumstances that led to its adoption. *Id.* Our goal is to ascertain the meaning of the provision most likely intended by its framers. *Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 54, 11 P3d 228 (2000).

The text of the constitutional provision refers to a taking of "private" property. In mid-nineteenth-century

usage, the term ordinarily was taken to mean, among other things:

> "1.   Properly, separate; unconnected with others; hence, peculiar to one's self; belonging to or concerning an individual only; as a man's *private* opinion, business or concerns; *private* property; the king's *private* purse; a man's *private* expenses. Charge the money to my *private* account in the company's books.

> "2.   Peculiar to a number in a joint concern, to a company or body politic; as the *private* interest of a family, of a company or of a state; opposed to *public*, or to the general interest of nations.

> "* * * * *

> "6.   Individual; personal; in contradistinction from *public* or *national*; as *private* interest."

Noah Webster, 2 *An American Dictionary of the English Language* (1828) (emphasis in original).[1] Thus, in some cases, the term "private" could be used in contradistinction from "public." But, in other cases, the fact that a public entity held an interest did not necessarily mean that it was not "private." The second quoted definition clearly suggests that a public entity such as a state may have "private" interests.

The relevant history associated with the adoption of Article I, section 18, appears unenlightening, at least with respect to this particular issue. The record of the debates at the Oregon Constitutional Convention of 1857 reveals nothing of relevance to the meaning of the term "private" or to the question whether municipal corporations could maintain actions to enforce that section of the constitution. Nor have we located anything of relevance from the text or history of the portion of the Indiana Constitution of 1851, after which the wording of Article I, section 18, was modeled. Charles Henry Carey, *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857* 468 (1926).

Nineteenth-century case law around the nation, however, did recognize that public entities such as state and municipal governments could own property either in public,

---

[1] There is no page numbering in the 1828 edition.

"governmental," capacities, or in private, "proprietary," capacities. *See generally* Julius L. Sackman, 2 *Nichols on Eminent Domain* § 5.06[8] (3d ed 2002); *see also, e.g., Martin v. Waddell*, 41 US (16 Pet) 367, 413-16, 10 L Ed 997 (1842) (distinguishing between property owned by the Duke of York in his "regal" capacity as opposed to property held "for his own individual emolument").[2] Depending on the capacity in which the municipal government held a given piece of property, it could be entitled to compensation for a taking of that property under the state or federal constitutional takings clause. Sackman, 2 *Nichols on Eminent Domain* § 5.06[8][a].

At least for a time, the Oregon courts employed that governmental/proprietary distinction. Thus, in *Simon v. Northup*, 27 Or 487, 502, 40 P 560 (1895), the Oregon Supreme Court explained:

"A city occupies, as it were, a dual relation to the state,—the one governmental or political, and the other proprietary or private. In its governmental or political capacity it is nothing more than a mere governmental agent, subject to the absolute control of the legislature, except as restricted by the constitution, and such property and easements as it may have in public streets and ways is held by it in such capacity, and at the will of the legislature. But, on the other hand, such property as it may hold or acquire in its proprietary or private capacity is as much protected by the constitution as the property of the private citizen, and of which it cannot be deprived except for public purposes, and then only upon just compensation."

---

[2] The dispute in *Martin* centered on the ownership of oyster beds along the New Jersey shore. Some claimants asserted ownership as successors of the Duke of York, who had received charters from his brother, King Charles II, in 1664 and 1674 to the land that later formed the State of New Jersey. The charters conferred both sovereign rights to the territory and private property rights. The sovereign rights were later ceded back to the crown, but the private property rights remained. The problem was that there was no clear distinction between the two. Meanwhile, the other claimants asserted ownership of the oyster beds under a New Jersey statute, enacted in 1824, which permitted the state to lease oyster beds as a way of raising revenue.

The Supreme Court upheld the claims based on the state statute. The court held that the rights to submerged lands were rights of sovereignty, not private property. Therefore, when New Jersey declared independence from Great Britain, it succeeded to those sovereign rights. *See generally* Carl B. Swisher, V *History of the Supreme Court of the United States: The Taney Period 1836-64*, 749-51 (1974).

In later years, however, the governmental/proprietary distinction was subjected to "sustained and withering criticism." *Hale v. Port of Portland*, 308 Or 508, 519, 783 P2d 506 (1989). In *Northwest Natural Gas Co. v. City of Portland*, 300 Or 291, 302, 711 P2d 119 (1985), the court held that the distinction is "unworkable, untenable and unhelpful," at least in deciding the rights of a city to relocate utility facilities within public rights-of-way.

An interesting question arises whether the *subsequent* rejection of the common-law distinction between owning property in a governmental, as opposed to a proprietary, capacity affects the meaning of the constitutional provision, which is established by the intentions of the framers, regardless of subsequent changes in the law. *See, e.g., State v. Fugate*, 332 Or 195, 213-14, 26 P3d 802 (2001) (meaning of *ex post facto* clause of Article I, section 21, determined by reference to the intentions of framers regardless of subsequent changes in underlying case law). Fortunately, we need not address that question, because the Oregon courts have determined that, even when the governmental/proprietary distinction applies, a municipality owns a public park in a governmental, not a proprietary, capacity. Directly on point in that regard is *Etter v. City of Eugene*, 157 Or 68, 71, 69 P2d 1061 (1937), in which the Supreme Court held that, in owning and maintaining a public park, a city acts "to promote the public health and welfare and, therefore, in a governmental capacity."

In other words, even assuming that Article I, section 18, in referring to takings of "private" property, can be taken to refer to municipal ownership of property in a proprietary capacity, the fact remains that the municipal ownership of a park is not proprietary. Accordingly, there is no basis, at least not under the facts alleged in the complaint in this case, for the city to maintain an action to enforce Article I, section 18, against the district.

There remains the city's reliance on Article XI, section 4, which provides that "[n]o person's property shall be taken by any corporation under authority of law, without compensation being first made, or secured in such manner as may be prescribed by law." The city argues that that section

plainly applies because the city is a "person" within the meaning of the section, and its property was taken by a "corporation." The district responds that the city is not a "person" and that water districts are not "corporations" within the meaning of Article XI, section 4.

Once again, we examine the text of the disputed constitutional provision, its enactment history, and the case law construing it. *Priest*, 314 Or at 415-16. We begin with the question whether the city is a "person" within the meaning of Article XI, section 4. That section is part of the original constitution, adopted in 1857. Dictionaries contemporaneous with the adoption of the constitution reveal that the term "person" commonly included corporations. Bouvier, for example, explained that the term "person," while often referring to individuals, was "also used to denote a corporation, which is an artificial person." John Bouvier, 2 *A Law Dictionary* 258 (1839). Webster similarly notes that, "[i]n *law*, an *artificial person* is a corporation or body politic." Webster, 2 *An American Dictionary* (emphasis in original). Conversely, the term "corporation" commonly was defined with reference to a corporation's status as an artificial "person." Thus, for example, Burrill explained, "A corporation has been declared to be not only a *person*, but to be capable of being considered an *inhabitant* of a state, and even of being treated as a *citizen*, for all purposes of suing and being sued." Alexander M. Burrill, 1 *A Law Dictionary* 383 (1867) (emphasis in original; citations omitted); *see also* Bouvier, 1 *A Law Dictionary* at 241 (defining "corporation" as "an intellectual body * * * which for certain purposes is considered as a natural person"); Webster, 1 *An American Dictionary* (defining corporation as "[a] body politic or corporate, formed and authorized by law to act as a single person * * * [s]uch corporations are the mayor and aldermen of cities"). Thus, the text of the constitution, at least by itself, offers no impediment to the city being considered a "person" within the meaning of Article XI, section 4.

The enactment history of the provision likewise contains no evidence that the framers intended the term "person" to exclude municipal and corporate entities. Article XI, section 4, was taken from the Michigan Constitution of 1850. Carey, *The Oregon Constitution and Proceedings* at 478. That

state's constitution included a provision barring the taking of property "by any corporation for public use" without compensation. Mich Const, Art XV, § 9 (1850). The Oregon Constitutional Convention adopted that provision as part of a larger article regarding "Corporations and Internal Improvements" without discussion or debate concerning the takings clause. Carey, *The Oregon Constitution and Proceedings* at 230-65. We are aware of no decisions of the Michigan courts construing the provision before the adoption of the Oregon Constitution. *See State v. Cookman*, 324 Or 19, 28-29, 920 P2d 1086 (1996) (referring to decisions of Indiana courts construing a provision of the Indiana Constitution that was adopted by the Oregon Convention).

Early nineteenth-century case law, however, suggests that—consistently with the definitions reflected in dictionaries of the time—the term "person" generally was understood to include municipal corporations. In *Commissioners of Kensington v. County of Philadelphia*, 13 Pa 76 (1850), for example, the issue was whether a municipal corporation was entitled to bring suit for injury to its property under an 1841 statute that provided:

> "In all cases where any dwelling house or other building or property real or personal, has been or shall be destroyed, within the county of Philadelphia, in consequence of any mob or riot, it shall be lawful for the *person or persons* interested in, and owning such property, to bring suit against the said county where such property was situated, and being for the recovery of such damages as he or they sustained by the reason of the destruction thereof, and the amount which shall be recovered in said action, shall be paid out of the county treasury, on warrants drawn by the commissioners thereof * * *."

*Id.* at 77 (emphasis in original). The Nanny Goat Market in Kensington was destroyed during a riot in 1844.[3] The city

---

[3] The 1840s saw the rise of the so-called "nativist" movement, which was characterized by anti-immigrant and anti-Catholic sentiments. Among other things, the nativists urged the adoption of a 25-year residency requirement for citizenship and daily readings from the King James Bible in public schools. The nativists were bound to face trouble in Philadelphia, which during the 1840s had the second largest Irish-Catholic population in the United States. Kensington, located just north of Philadelphia, had an especially large number of Irish-Catholic immigrants. On May 3, 1844, a group of nativists rallied in Kensington, prompting a melee during

sued Philadelphia County for damages under the 1841 statute, but the county argued that municipal corporations were not "persons" within the meaning of the act. The Pennsylvania Supreme Court disagreed: "A municipal corporation is a person as distinctly within the letter of the act * * * as is a bank, or any other company chartered for private emoluments[.]" *Id.* at 78.

More to the point is *Donnaher v. The State of Mississippi*, 16 Miss (8 S & M) 649 (1847). In that case, the State of Mississippi—apparently on behalf of the City of Jackson—sued to recover damages when the Jackson and Brandon Railroad and Bridge Company dug up city property for the extension of a railway line pursuant to a legislative grant of authority. The company argued that the statute authorizing the company to extend its lines through municipal property made no reference to an obligation to pay for damaged or confiscated property. The state argued that the enactment did not relieve the company from paying for the privilege; otherwise, the state argued, the statute would run afoul of the command in the Mississippi Constitution that "[n]o person's property shall be taken or applied to public use * * * without compensation first being made therefor." *Id.* at 657.

The Mississippi High Court of Errors and Appeals agreed with the state, holding that, although the railroad may have had legislative authority to take property for public use, "this is always upon the condition that just compensation shall be made to the owner." *Id.* at 660. The fact that the owner of the property was a municipal corporation, the court held, was of no moment. The principle that property may not be taken without compensation, the court held,

"applies as forcibly to the streets in this instance, as to private property in other cases. In the case of *The Tuckahoe Canal Company v. The Tuckahoe Railroad Company*, 11 Leigh, 76, the court says:—'It is not perceived that the property of a corporation is less liable to the exercise of the *jus*

---

which shots were fired and several nativists were killed. On May 8, 1844, the nativists retaliated with a full-scale invasion of Kensington. Nine persons were killed, and many buildings were destroyed, including a score of homes, St. Michael's Catholic Church, and the Nanny Goat Market. Michael Feldberg, *The Philadelphia Riots of 1844: A Study of Ethnic Conflict* 99-116 (1975).

*publicum*, than the property of a private individual. In both cases, the private right must yield to the necessities of the public, and in both the public must make compensation for the loss.' * * *

"* * * * *

"* * * The right to the streets in this case being in the corporation of Jackson, they cannot be subjected to the use of the railroad, without the consent and contract of the corporation, or without the assessment and payment of damages according to law."

*Id.* at 660-61.[4]

The foregoing authority strongly suggests that the framers would have understood that the term "persons" in Article XI, section 4, included municipal corporations. Moreover, we have located no authority suggesting the contrary. We therefore conclude that the city in this case is a "person" within the meaning of Article XI, section 4.

We turn, then, to whether the district is a "corporation" for purposes of the same constitutional provision. The city argues that the term plainly encompasses both private and public corporations. The district disagrees, contending that Article XI, section 4, "was not drafted to protect the citizens of Oregon from governmental subdivisions."

Article XI uses the term "corporation" to refer to both private and public corporations. Article XI, section 2, for example, expressly refers to the incorporation of municipalities, cities, and towns. Article XI, section 3, on the other hand, refers to corporations as private business entities that have "stockholders." Article XI, section 5, though, refers to legislative acts "incorporating towns, and cities." Article XI, section 8, similarly refers to a prohibition on the state assuming the debts of "any county, town, or other corporation whatever."

---

[4] The court went so far as to suggest that property owned by a municipal corporation would be protected by the other takings provision of the Mississippi Constitution that prohibited takings of "private property" for public use without compensation, a constitutional provision that the state did not rely on. *Donnaher*, 16 Miss (8 S & M) at 600. Thus, in the Mississippi court's view, municipal corporations were not only "persons" but private persons for purposes of condemnation actions. The court's sweeping phrasing was later questioned in *Hodges v. Western Union Tel. Co.*, 72 Miss 910, 916-18, 18 So 84 (1895).

The question, of course, is in what sense the framers used the term in Article XI, section 4, which employs the unadorned term "corporations" without any reference to stockholders or municipalities. Given the lack of any phrasing of limitation, it stands to reason that the framers intended a broad interpretation that included both private and public corporations.

The Oregon Supreme Court said precisely that, albeit in *dictum*, in *State ex rel Eckles v. Woolley*, 302 Or 37, 726 P2d 918 (1986). Referring to the various meanings of the term "corporations," the court explained:

> "The 19th century drafters of the constitution knew 'corporations' as institutions for conducting public and communal as well as charitable and educational affairs and also as a legal form for conducting gainful private enterprises, a form that the English and American governments at first created by special charters but later made available by general incorporation laws to replace the earlier joint stock companies.

> "Other sections of Article XI further show the convention's understanding of its distinction in section 2 between the kind of corporations that could 'be formed under general laws' and corporations that could be specifically created 'for municipal purposes.' Section 3 limited the liability of 'stockholders of all corporations, and joint stock companies' to the amount of their stock subscriptions. Here, 'all corporations' plainly meant only business corporations, the kind that had stockholders. *Section 4 then and now prescribes that 'corporations' may not take property under authority of law (by eminent domain) without compensation being first made or secured. This 'authority of law' could be and was extended both to municipal corporations and to business enterprises such as railroad or utility companies. * * *

> "Perhaps one should not make too much of the diverse uses of the term 'corporation' in Article XI. Only sections 1 and 9 were original; the remaining sections were taken from the constitutions of several other states. Nonetheless, it is apparent that the convention used the term both for municipalities ('incorporated' towns and cities) and for private business corporations."

*Id.* at 40-41 (emphasis added; footnote omitted).

In this case, there is no question but that the district is a municipal corporation. ORS 553.090 expressly designates a water control district as "a public body, corporate and politic, exercising public power." Water districts also are referred to as municipal corporations for purposes of local budget laws, ORS 294.316(9), and hydroelectric project permitting, *Steamboaters v. Winchester Water Control Dist.*, 69 Or App 596, 602, 688 P2d 92 (1984), *rev den*, 298 Or 553 (1985). We conclude that the district is a "corporation" within the meaning of Article XI, section 4.

The district insists that, even if Article XI, section 4, otherwise could apply, it does not do so in this case, because the district merely took property that already was devoted to public use. As a general rule, the state legislature *can* authorize one governmental unit to take public property from another governmental unit for public use without compensation. *See generally* Sackman, 2 *Nichols on Eminent Domain* § 5.06[8][a]. But, because water districts are creatures of limited authority, *see, e.g., Young*, 129 Or at 548 ("An irrigation district is a creature of the law, its powers are conferred by law and the powers and duties of its officers are defined and limited by the statute."), the question whether the legislature actually did so is one of statutory construction. In this case, the district cites no statute that permits it to take public property without compensation. To the contrary, ORS 553.270 expressly provides that, although a water control district may take property already devoted to public use, it must pay for the privilege.

The district finally argues that, in any event, there was no "taking" of the city's property. According to the district, the complaint in this case alleges merely that city property was damaged by flooding, and "[t]he Oregon Constitution does not require payment of just compensation for mere damage."

The Supreme Court's decision in *Vokoun v. City of Lake Oswego*, 335 Or 19, 56 P3d 396 (2002), disposes of that argument. In that case, the court held that flood damage that causes "substantial interference" with the property rights of

a landowner may give rise to a claim for inverse condemnation. *Id.* at 29; *see also Tomasek*, 196 Or at 150-51 (flood damage may support claim for inverse condemnation); *Patterson v. Horsefly Irrigation Dist.*, 157 Or 1, 18-19, 69 P2d 282 (1937) (same). The city's complaint in this case alleges that its property was damaged and its bridge was completely destroyed because of the district's decision not to release water over the Parkersville Dam. Under *Vokoun*, that allegation is sufficient to state a claim for inverse condemnation.

The district advances no other argument for rejecting Article XI, section 4, as a basis for asserting a claim for inverse condemnation in this case.[5] We therefore conclude that the trial court erred in holding that the city failed to state a claim for relief on that basis.

Reversed and remanded.

---

[5] For example, the district does not contend that, when it decided to take the action that resulted in the flooding of city property, it was not acting "under authority of law," as that phrase is used in Article XI, section 4.