Argued and submitted October 11, 2005, affirmed May 17, 2006

# LIBERTY NORTHWEST INSURANCE CORPORATION,
## *Appellant,*

*v.*

# OREGON INSURANCE GUARANTEE ASSOCIATION,
## *Respondent.*

## 0307-08018; A126364

136 P3d 49

James L. Hiller argued the cause for appellant. With him on the briefs was Hitt Hiller & Monfils LLP.

Jonathan M. Hoffman argued the cause for respondent. With him on the briefs were John L. Langslet, Stephen P. Yoshida, and Martin, Bischoff, Templeton, Langslet & Hoffman, LLP.

Before Landau, Presiding Judge, and Wollheim and Rosenblum, Judges.

LANDAU, P. J.

## LANDAU, P. J.

Plaintiff Liberty Northwest Insurance Corporation (Liberty) brought a subrogation claim against an insurer that had covered tortfeasors who had caused injuries to one of Liberty's insureds. The insurer became insolvent. Liberty then submitted its subrogation claim to defendant Oregon Insurance Guarantee Association (OIGA). OIGA, however, refused to pay, invoking Oregon statutes that provide that OIGA is not obligated to pay subrogation claims. Liberty then initiated this action for a declaratory judgment to the effect that the statutes on which OIGA relied to deny the subrogation claim violate the remedy guarantee stated in Article I, section 10, of the Oregon Constitution. The parties filed cross-motions for summary judgment. The trial court granted OIGA's motion, denied Liberty's, and entered judgment accordingly. Liberty appeals, and we affirm.

## I. FACTUAL BACKGROUND

The relevant facts are undisputed. Liberty is the workers' compensation insurance carrier for Coos County, Oregon. A Coos County employee, Westgaard, was injured on the job as the result of a car accident with Clifton, who was driving a vehicle for his employer, Knutson Tow Boat Company.

Liberty paid $92,000 in workers' compensation benefits to Westgaard for his compensable injury. Meanwhile, Westgaard pursued a third-party claim against both Clifton and Knutson pursuant to ORS 656.576 and ORS 656.596. At the time of the accident, Clifton and Knutson were insured for liability by Reliance Insurance Company (Reliance). By the time Westgaard had initiated his third-party action against Reliance, the insurance company had initiated insolvency proceedings in Pennsylvania.

Oregon law provides a system of protection for claims against insolvent insurers through OIGA. OIGA is an association created by statute for the purpose of avoiding financial loss to claimants or policyholders because of the insolvency of an insurer. ORS 734.520. All property and casualty insurance companies admitted to do business in Oregon

are required to be members of OIGA. ORS 734.550. Both Liberty and Reliance are member insurers of OIGA.

When a member insurer is declared insolvent, OIGA assumes the duties of the insolvent insurer for covered claims brought by Oregon claimants. ORS 734.570(1). OIGA acts as, in effect, a "carrier of last resort" that provides a "safety net" for insureds. *See generally Carrier v. Hicks*, 316 Or 341, 347, 851 P2d 581 (1993). OIGA obtains the funds to pay covered claims from assessments levied against the member insurers. ORS 734.570(3).

OIGA's liability to pay claims is not unlimited. It is obligated to pay "covered claims." Under ORS 734.510(4)(b), a "covered claim" does not include "[a]ny amount due any reinsurer, insurer, insurance pool or underwriting association as *subrogated recoveries or otherwise*[.]" (Emphasis added.) ORS 734.695(1) likewise provides that "[t]he insured of an insolvent insurer may not be personally liable for amounts due any reinsurer, insurer, insurance pool or underwriting association *as subrogation recoveries or otherwise* up to the applicable limits of liability provided by the insurance policy issued by the insolvent insurer." (Emphasis added.)

In this case, upon Reliance's insolvency, OIGA stepped in to defend against Westgaard's third-party claim. Because Liberty already had paid $92,000 in workers' compensation benefits to Westgaard, Liberty had a statutory lien on any recovery that Westgaard might obtain. ORS 656.580; ORS 656.593. Accordingly, Liberty sought to assert that lien against OIGA.

OIGA responded that it could pay Liberty nothing, explaining that it is prohibited from doing so because the claim against Reliance, the insolvent insurer, is not a "covered claim" within the meaning of the relevant statutes. According to OIGA, both ORS 734.695 and ORS 734.510 provide that "covered claim" does not include subrogation claims. Liberty agreed that its claim was a subrogation claim, but it insisted that OIGA had an obligation to pay it, even if the statutes provided otherwise. In correspondence with OIGA, Liberty explained that, to the extent that ORS

734.695 and ORS 734.510 preclude OIGA from paying subrogation claims, those statutes are unconstitutional. According to Liberty, subrogation is a claim that is as old as the common law itself and thus cannot be eliminated by statute without violating the guarantee of a right to a remedy provided in Article I, section 10, of the Oregon Constitution.

The parties attempted to settle their differences. In the end, they agreed only to the following: First, OIGA agreed to pay Westgaard $90,000. Second, Liberty agreed to continue to pay Westgaard workers' compensation benefits. Third, Liberty agreed that its subrogation claim against Reliance would not exceed $92,000. Finally, the parties agreed that the constitutionality of ORS 734.695 and ORS 734.510 would have to be determined by the courts.

Liberty then initiated this declaratory judgment proceeding, seeking a determination that ORS 734.695 and ORS 734.510(4)(b)(B) together extinguish Liberty's common-law right to subrogation against a tortfeasor and thereby violate Article I, section 10, of the Oregon Constitution.

The parties submitted cross-motions for summary judgment. In essence, Liberty asserted that the right of subrogation can be traced to Article 9 of *Magna Carta* and, as a result, is an absolute right protected by Article I, section 10. That is, under *Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 23 P3d 333 (2001), the legislature may not abrogate that right without providing an adequate substitute. In this case, Liberty argued, the legislature abrogated the right of subrogation and provided no substitute at all.

OIGA responded that the trial court did not need to address Liberty's constitutional contentions because (1) Liberty's claim is not ripe, given that it could pursue remedies in the Pennsylvania insolvency proceeding; (2) Liberty has waived any claim against OIGA because it is a member of the association; and (3) the equities favor OIGA. As for Liberty's Article I, section 10, argument, OIGA responded by arguing that (1) the challenged statutes do not actually violate the constitution; (2) Liberty, being a corporation, is not entitled to protection under Article I, section 10; and (3) *Smothers* incorrectly concluded that Article I, section 10, operates as a guarantee of any particular remedy.

In response, Liberty offered an affidavit to the effect that the Pennsylvania proceeding is "likely to result, at best, in a payout to Liberty of pennies on the dollar." Accordingly, Liberty argued, the case is entirely ripe for review. OIGA did not object to the admissibility of the affidavit, and the trial court did not exclude it from the summary judgment record.

The trial court granted OIGA's motion and denied Liberty's.

## II. ANALYSIS

On appeal, Liberty argues that the trial court erred in granting OIGA's summary judgment motion and in denying its own motion. It argues that, under *Smothers,* the Oregon legislature is constitutionally prohibited from abrogating the right of subrogation as it plainly did in enacting ORS 734.695 and ORS 734.510.

OIGA responds with a slightly different array of arguments. It still contends that we need not address Liberty's constitutional arguments, but because (1) the case is not ripe; and (2) Liberty, as a member of OIGA, should be estopped from challenging the constitutionality of the disputed statutes. On the constitutional question, OIGA continues to assert that (1) the statutes do not violate the remedy clause; (2) Liberty, as a corporation, is entitled to no protection under that clause in any event; and (3) *Smothers* was wrongly decided.

In short, we conclude that OIGA is incorrect in asserting that the case is not ripe. We also conclude that it has not preserved its argument that Liberty should be estopped from challenging the constitutionality of the statutes at issue. As for the constitutional issues, however, we agree with OIGA that Liberty, being a corporation, is not subject to the protection of Article I, section 10. Consequently, we need not address OIGA's other constitutional arguments.

### A. *Ripeness*

We begin with OIGA's argument that Liberty's claim is not "ripe." We do so because, depending on the sense in which OIGA employs the term, the argument could implicate issues of justiciability. According to OIGA, Liberty's claim is

not "ripe" because there is no evidence that it filed a proof of claim in the Pennsylvania insolvency proceeding. According to OIGA, there can be no violation of Article I, section 10, unless Liberty has been left without a "substantial" remedy. In this case, OIGA argues, because Liberty made no effort to assert its claim in Pennsylvania, there is no way to know whether it has, in fact, been left without a substantial remedy. OIGA acknowledges that Liberty offered an affidavit stating that resort to the Pennsylvania insolvency proceeding would have resulted, at best, in a marginal recovery. OIGA insists that the affidavit is "self-serving" and "would not be admissible in evidence."

As we noted in *Coast Range Conifers v. Board of Forestry*, 192 Or App 126, 129, 83 P3d 966 (2004), *rev'd on other grounds*, 339 Or 136, 117 P3d 990 (2005),

> "[t]he term 'ripeness' tends to be used somewhat loosely. Sometimes, it is used to refer to an aspect of the doctrine of justiciability, specifically, the requirement that there be an actual, as opposed to a hypothetical, injury to the individual invoking the judicial power. * * * Sometimes, the term is used more broadly to assert that the complaining party has failed to allege or prove an element of the claim involved."

(Citations omitted.) In this case, OIGA's argument clearly is of the latter sort; that is, it consists of an assertion that Liberty has failed to prove an essential element of its constitutional claim on the merits.

That said, we may nevertheless dispose of the argument quickly. To begin with, it is predicated on the inadmissibility of Liberty's affidavit stating as a factual matter that resort to the Pennsylvania insolvency proceeding would produce an insignificant recovery. The problem is that there is no ruling excluding the affidavit on that ground. In fact, so far as we can tell, there was no objection concerning the admissibility of the affidavit at trial. OIGA cannot object to the admission of the affidavit at this late stage. *See Hickey v. Settlemier*, 318 Or 196, 206 n 9, 864 P2d 372 (1993) (in the absence of an objection to a specific part of a document, an appellate court will hold that no error occurred in considering the entire document); *Gray v. Salem-Keizer School District*, 139 Or App 556, 562, 912 P2d 938, *rev den*, 323 Or 265 (1996)

(failure to object to the admission of an affidavit offered on summary judgment precludes assigning error to consideration of that affidavit).

In any event, OIGA does not explain—and we do not understand—how the existence of a remedy in some other jurisdiction is relevant to the question whether the Oregon legislature unconstitutionally eliminated a remedy in violation of Article I, section 10, which concerns the availability of remedies under Oregon law. We reject OIGA's ripeness argument without further discussion.

B.  *Estoppel*

■      Consistently with the "first things first" doctrine, *see Li v. State of Oregon*, 338 Or 376, 391, 110 P3d 91 (2005); *Leo v. Keisling*, 327 Or 556, 560, 964 P2d 1023 (1998) (courts should decide cases on subconstitutional grounds before reaching constitutional issues), we turn to OIGA's argument that we need not reach the constitutional issues that Liberty raises.

OIGA contends that Liberty, as a member insurer, has reaped certain benefits of participating in OIGA and is therefore estopped from challenging portions of OIGA's enacting legislation. At trial, however, OIGA did not advance that argument. Instead, it argued that Liberty had *waived* any right to object to the constitutionality of the disputed statutes. Estoppel and waiver are distinct theories, and different factors apply to each. *See Coast Range Conifers LLC*, 189 Or App at 536-37 (waiver and estoppel discussed as distinct theories).

Because Liberty proposes estoppel as an alternative basis for *affirmance*, preservation is not an impediment, *per se*. Under *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001), however, we may consider an alternate ground for affirmance only if the assertion of the ground at trial would not have required the development of a different record. In this case, as we have noted, estoppel by acceptance of benefits involves factors that were not addressed before the trial court and that would have required the parties to develop a different record from what

was developed on summary judgment. For example, the parties would need an opportunity to address the extent to which Liberty "accepted benefits" from OIGA (assuming that mandatory participation in a statutory program can be characterized as "accepting benefits") while knowingly refraining from challenging the constitutionality of the statutes at issue. *See Hess v. Seeger*, 55 Or App 746, 762, 641 P2d 23 (1982), *rev den*, 293 Or 103 (1982) (setting out elements of estoppel by acceptance of benefits). They would also need an opportunity to address the extent to which OIGA detrimentally relied on Liberty's failure to challenge the statutes earlier and the extent to which it was "without knowledge or means of knowledge" of the basis of Liberty's claims in this case. *Id.* There is nothing about any of that in the record. We reject OIGA's reliance on estoppel as an alternative ground for affirmance without further discussion.

C.  *Article I, section 10*

■  We turn, then, to Liberty's main argument—that ORS 734.695 and ORS 734.510 violate Article I, section 10, of the Oregon Constitution. That section provides that "[n]o court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

In *Smothers*, the Oregon Supreme Court analyzed the second independent clause of Article I, section 10—the "remedy clause"—and concluded that it protects "absolute common-law rights" that existed when the Oregon Constitution was drafted by guaranteeing that there will always be a remedy for injury to those rights. 339 Or at 118. The court said that a remedy clause challenge necessitates two inquiries: (1) At the time the Oregon Constitution was drafted, did the common law of Oregon recognize a remedy for the injuries sustained? (2) If so, and if the legislature has abolished the common-law remedy, has the legislature provided an adequate substitute remedy? *Id.* at 124.

In this case, Liberty argues that, at the time the state constitution was drafted, the common law of Oregon recognized the remedy of subrogation. Indeed, Liberty

argues, subrogation is one of the oldest remedies known to the Anglo-American common law, dating to section 9 of *Magna Carta*.[1] Following the analytical framework set out in *Smothers*, Liberty then argues that ORS 734.695 and ORS 734.510 plainly abolish the common-law remedy of subrogation, at least in the context of this case. And, argues Liberty, it is equally plain that the Oregon legislature has provided no substitute remedy at all.

OIGA responds that the challenged statutes do not violate the remedy clause because Liberty has not suffered the sort of "injury" to which the remedy clause applies. In any event, OIGA argues, the remedy clause protects every "man" from such injury, and artificial entities such as corporations are not "men" within the meaning of the remedy clause. Even if that is not so, OIGA argues, the very idea that Article I, section 10, contains a "remedy clause" is in error. OIGA acknowledges that *Smothers* is to the contrary. According to OIGA, however, the historical analysis on which the Supreme Court relied in that case has been demonstrated to be incorrect. *See, e.g.*, Jonathan M. Hoffman, *Questions Before Answers: The Ongoing Search to Understand the Origins of the Open Courts Clause*, 32 Rutgers LJ 1005 (2001).

Whether the historical predicate for the Supreme Court's analysis in *Smothers* was correct is a matter for historians and the Supreme Court to address. We are in no position to entertain the issue. We therefore limit our analysis to the question whether, given the analytical framework that *Smothers* articulated, the trial court correctly concluded that Liberty did not establish a violation of the remedy clause of

---

[1] According to Liberty, the right of subrogation was recognized in Article 9 of *Magna Carta*, which provides:

"Neither We nor Our bailiffs shall seize any land or rent for any debt so long as the debtor's chattels are sufficient to discharge the same; nor shall the debtor's sureties be distrained so long as the debtor is able to pay the debt. If the debtor fails to pay, not having the means to pay, then the sureties shall answer the debt, and, if they desire, they shall hold the debtor's lands and rents until they have received satisfaction of the debt which they have paid for him, unless the debtor can show that he has discharged his obligation to them."

A. E. Dick Howard, *Magna Carta, Text and Commentary*, 39, Revised Edition (1998).

Article I, section 10. Because it is dispositive, we further limit our analysis to the question whether Liberty, a corporate entity, is even subject to the protection of the remedy clause.

■     That particular issue the Oregon courts have not yet addressed. In analyzing a provision of the original constitution, we are to examine its text, the historical circumstances that led to its adoption, and any case law construing it. *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992). Our goal is to ascertain the meaning of the constitution that was intended by its framers and the people who enacted it. *State v. Ciancanelli*, 339 Or 282, 289, 121 P3d 613 (2005); *Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 54, 11 P3d 228 (2000).

   1.   *Text*

■     We begin with the text of Article I, section 10, which provides, in part, that "every *man* shall have remedy by due course of law[.]" (Emphasis added.) In examining the text of the constitution, we generally assume that the framers and the people intended it to carry the meaning ordinarily given the words that it contains. *See Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 560, 871 P2d 106 (1994); *Kerr v. Bradbury*, 193 Or App 304, 311, 89 P3d 1227 (2004), *rev dismissed*, 340 Or 241, 131 P3d 737 (2006).

To determine the "ordinary" meaning of terms in the mid-nineteenth century, courts commonly resort to contemporaneous dictionaries. *See, e.g.*, *Rico-Villalobos v. Giusto*, 339 Or 197, 206-07, 118 P3d 246 (2005) (citing nineteenth- and early twentieth-century dictionaries as evidence of meaning of original provisions of constitution). To be sure, mid-nineteenth-century dictionaries were not particularly good, at least by modern lexicographical standards. They often consisted of little more than recycled definitions from earlier dictionaries, definitions that were made up out of whole cloth, or of references to the King James Bible, which itself was over two centuries old by that time. *See, e.g.*, Rickie Sonpal, *Old Dictionaries and New Textualists*, 71 Fordham L Rev 2177, 2205-15 (2003) (critique of judicial reliance on old dictionaries, because of lack of lexicographical standards for determining definitions, the use of acontextual definitions, wholesale piracy of definitions of other dictionaries, and the

tendency of early dictionary writers to be prescriptive—rather than descriptive—in their definitions). As accurate reports of usage, therefore, they are suspect. Nevertheless, they were commonly employed by the people of the time. Noah Webster's *An American Dictionary of the English Language* was especially popular. *See generally* Jonathan Green, *Chasing the Sun: Dictionary Makers & The Dictionaries They Made* 318-22 (1996). For all their faults by modern standards, therefore, they remain as some evidence from which we may draw inferences about what people relying on them at the time likely thought about the meaning of words.

In ordinary parlance, the term "man" was understood to refer to a human being of the male gender or to human beings generally. It was not, however, used to refer to artificial entities such as corporations. Thus, Webster's 1828 dictionary reported 13 different uses of the term "man," none of which referred to an artificial entity. Webster, for example, reported that the word "man" could mean, among other things, "the human race; the whole species of human beings" "a male individual of the human race, of adult growth or years," "a servant or attendant of the male sex," "a male adult of some uncommon qualifications," or "an individual of the human species." Noah Webster, 2 *An American Dictionary of the English Language* (unpaginated) (1828). Webster reported that, in particular, "[i]n matters of equity between man and man—[u]nder this phraseology, females may be comprehended. So a law restraining man, or every man from a particular act, comprehends women and children, if of competent age, to be the subjects of law." *Id.*

In the law, the word "man" apparently carried the same meaning. In Bouvier's *A Law Dictionary, Adapted to the Constitution and Laws of the United States of America, and of the Several States of the American Union* (rev 6th ed 1856), the term "man" was defined as follows:

> "A human being. This definition includes not only the adult male sex of the human species, but women and children; examples: 'of offences against man, some are more immediately against the king, others more immediately against the subject.' * * * Offences against the life of man come under the general name of homicide, which in our law signifies the killing of a man by a man."

(Citations omitted.) Burrill's definition of "man" refers only to the use of the term in feudal law, as a "vassal; a tenant or feudatory. The Anglo-Saxon relation of *lord and man* was originally purely personal and founded on mutual contract." Alexander M. Burrill, 2 *A Law Dictionary and Glossary* 699 (1851) (emphasis in original).

Our determination of the meaning most likely intended by the framers is not accomplished by reference to dictionaries alone; we must examine the manner in which the relevant terms are employed in context. *State v. Hirsch / Friend*, 338 Or 622, 634, 114 P3d 1104 (2005). In this case, the other words in the remedy clause itself suggest that the framers intended the term "man" to be used in its ordinary sense, that is, as a reference to natural—and not artificial—persons. The clause provides that "every man shall have remedy by due course of law for injury done *him in his* person, property, or reputation." (Emphasis added.) The pronouns are the objective and possessive forms, respectively, of the word "man" used in reference to a natural person. Interestingly, Webster reported that the words "him" and "his" were once used for nouns of the neuter gender—in place of "it" and "its"—but that the practice not only was "improper," but also had become obsolete long before 1857. Webster, *An American Dictionary*.

Looking a bit beyond the immediate context, we also note that the Oregon Constitution employs the term "man" several other times, and, in each case, it is fairly clear that the term is used to refer only to natural persons. Article I, section 1, for example, declares that "all men, when they form a social compact are equal in right." In the political theory that was commonly understood at the time, human beings—not corporations—form a "social compact." *See* Claudia Burton and Andrew Grade, *A Legislative History of the Oregon Constitution of 1857—Part I (Articles I and II)*, 37 Willamette L Rev 469, 490-91 (2001) (quoting contemporaneous newspaper articles about the "social compact" clause). Article I, section 2, similarly declares that "[a]ll men shall be secured in the Natural right, to worship Almighty God according to the dictates of their own consciences." Natural persons—not corporations—worship.

Liberty insists that reference to the broader context demonstrates that, to the contrary, the framers would have understood the term "man" to embrace both natural and artificial persons. According to Liberty, "the words 'man' and 'person' are used interchangeably in the Bill of Rights of the Oregon Constitution." In support, Liberty relies on Article I, section 6, which states that "[n]o person shall be rendered incompetent as a witness, or juror in consequence of his opinions on matters of religeon [sic]." "Person," Liberty argues, clearly is employed to refer to natural persons only; corporations cannot testify except through natural persons. Accordingly, it concludes, the framers apparently regarded the terms "person" and "man" to be used "interchangeably."

Liberty is correct about this much: The word "person" was often employed in the mid-nineteenth century to refer to both natural and artificial entities. It simply does not follow from that fact, however, that the word "man" was employed likewise. Merely because one word may embrace another does not necessarily mean that the two terms are interchangeable. For example, merely because all dogs are animals, it does not necessarily follow that all animals are dogs. More to the point, merely because a broader word embraces two other words, it does not follow that those two other words are interchangeable. That is, merely because dogs and cats are both animals does not mean that all dogs are cats, or vice versa.

Contemporaneous dictionaries demonstrate that this basic logic was reflected in the vocabulary of the times. Webster, for example, reported that the word "person" ordinarily referred to "[a]n individual human being consisting of a body and soul. We apply the word to living beings only, possessed of a rational nature; the body when dead is not called a person. It applies alike to a man, woman or child." At the same time, Webster reported that, in law, the word *can* also refer to "an artificial person," which is "a corporation or body politic." Webster, 2 *An American Dictionary*. As we have noted, however, Webster did not suggest that an artificial person is a "man."

Reference to the actual wording of the constitution demonstrates that, indeed, sometimes the framers employed

the term "person" to refer to natural persons. For example, as Liberty correctly notes, Article I, section 6, clearly employs the term "person" to refer to natural persons only. So also do a number of others, for example, Article II, section 7, which provides that "[e]very person shall be disqualified from holding office during the term for which he may have been elected, who shall have given, or offered a bribe[.]" At the same time, the framers also employed the term to refer to artificial, as well as natural, persons. Article XI, section 4, for example, provides that "[n]o person's property shall be taken by any corporation under authority of law, without compensation first being made[.]" We have concluded, after examining the text and history of that provision, that it refers to the property of both natural and artificial persons, including municipal corporations. *City of Keizer v. Lake Labish Water Control Dist.*, 185 Or App 425, 437, 60 P3d 557 (2002), *rev den*, 336 Or 60 (2003).

Thus, whether the word "person" refers solely to a natural or an artificial person—or to both—depends on the context. But it emphatically does not follow that, merely because one provision of the Oregon Constitution uses the term "person" to embrace either natural or artificial persons, the term always does—much less that, *vice versa*, references to natural persons must encompass artificial ones.

Our examination of the text of the remedy clause in context, therefore, leads us to conclude that the framers would have understood it to apply to "men," that is, in the sense of all human beings, but not to artificial entities.

2. *Historical Circumstances*

As the Supreme Court noted in *Smothers*, there is no direct record of the Oregon framers' intentions with respect to Article I, section 10. *Smothers*, 332 Or at 114. Nor, apparently, is there anything of relevance to Oregon's remedy clause from the history of the almost identical clause of the Indiana Constitution of 1851, the primary source of the Oregon Constitution. *Smothers*, 332 Or at 106. And, in 1857, no Indiana court had yet construed Indiana's remedy clause. *Id.* at 108.

The Supreme Court, however, concluded that the principles reflected in the remedy clause of Article I, section 10, trace back to Edward Coke's commentary on *Magna Carta*; then to the American colonies both directly and through the further commentaries of Henry Care and William Blackstone, and early remedy clauses in revolutionary-era declarations of rights. *Smothers*, 332 Or at 94-104. The court did not address the particular issue before us, focusing instead on the substantive nature of the guarantee reflected in the words of Article I, section 10.

Nevertheless, we may observe that, in all of the sources on which the court relied in its historical analysis in *Smothers*, the express objects of the guarantee are natural, not artificial persons. *Magna Carta* itself—at least the version of it that Coke translated in his *Second Institutes*—provides that "[w]e will sell to no *man*, we will not deny or defer to any *man* either justice or right." Edward Coke, *The Second Part of the Institutes of the Laws of England* 45 (1797) (emphasis added).

Coke's exposition of the significance of that provision of *Magna Carta* likewise provides that it applies to the subjects of the crown in their private relations with one another:

> "[E]very subject of this realme, for injury done him in bonis, terris, vel persona, by any other subject, be he ecclesiastical, or temporall, free, or bond, man, or woman, old, or young, or be he outlawed, excommunicated, or any other without exception, may take his remedy by the course of the law, and have justice, and right for the injury done to him, freely without sale, fully without any deniall, and speedily without delay."

Coke, *Second Institutes* at 55. The list plainly refers to natural persons. Corporations have no gender and cannot be enslaved, outlawed, or excommunicated. *See, e.g., The Case of Sutton's Hospital*, 77 Eng Rep 960, 973 (KB 1612) (Coke, C. J.) ("[Corporations] cannot commit treason, nor be outlawed, nor excommunicate, for they have no souls.").

Blackstone, in his *Commentaries on the Laws of England*, wrote:

"The rights of persons considered in their natural capacities are also of two sorts, absolute, and relative. Absolute, which are such as appertain and belong to particular men, merely as individuals or single persons: relative, which are incident to them as members of society, and standing in various relations to each other. * * * By the absolute rights of individuals we mean those which are so in their primary and strictest sense; *such as would belong to their persons merely in a state of nature, and which every man is entitled to enjoy whether out of society or in it.*"

William Blackstone, 1 *Commentaries on the Laws of England* 119 (1765) (emphasis added). Again, Blackstone plainly referred to the rights of natural persons. Corporations have no rights "in a state of nature."

As the court noted in *Smothers*, in eighteenth-century America, colonists "began to describe their ancient common-law rights as 'natural rights'" that were derived from God. 332 Or at 100. John Adams, for example, wrote of "the inalienable, indefeasible rights of men, the honor and dignity of human nature, the grandeur and glory of the public, and the universal happiness of individuals." Edward Corwin, *The "Higher Law" Background of American Constitutional Law*, 42 Harv L Rev 149, 169 (1929) (quoting John Adams, *Life and Works* 440 (1851)); *see also* A.E. Dick Howard, *The Road from Runnymede: Magna Carta and Constitutionalism in America* 275-76 (1968) (noting tendency of colonial-era and early nineteenth-century judges to "do as colonial Americans had so often done and intertwine *Magna Carta* and the common law rights with natural right and justice and weave constitutional precedents, including *Magna Carta* and other British antecedents, with principles drawn from natural right and justice"). Those natural rights inured to natural, not artificial, persons.

The framers of early state constitutions and declarations of rights looked to the common law and the natural rights that it had come to reflect as the sources for the earliest remedy clauses. *Smothers*, 332 Or at 104-05. Not surprisingly, the earliest remedy clauses stated the guarantee expressly in terms of natural persons. The Maryland Declaration of Rights of 1776, for example, stated that "every *freeman*, for any injury done him in his person or property, ought

to have a remedy[.]" Bernard Schwartz, 1 *The Bill of Rights: A Documentary History* 281 (1971) (emphasis added). The Delaware Declaration of Rights similarly stated that "every *freeman* for injury done him in his goods, lands or person, by any other person, ought to have remedy by the course of the law of the land[.]" *Id.* at 277-78 (emphasis added).

Some states included remedy clauses in their constitutions in the years following the revolution, but they referred to "person" instead of "freeman." Article VIII, section 7, of Ohio's 1802 Constitution, for example, provides that "every person" shall have remedy by due course of law. Similarly, Article X, section 13, of the Kentucky Constitution of 1799 provided that "every person" shall have remedy by due course of law.

In that context, the constitution of Oregon speaks even more clearly. The framers had available to them other formulations of the right to a remedy by due course of law, including some that—at least arguably—might be construed to apply more broadly to artificial as well as natural persons. Yet the framers of the Oregon Constitution adopted the traditional formulation that referred to the right of every "man"—that is, every natural person—to a remedy for injury done him, not any "person."

It is difficult to imagine that the framers acted inadvertently in that regard. The distinction between natural and artificial persons was well known by the time of the framing of the Oregon Constitution. Blackstone had set out the classic distinction between the two nearly a century earlier, explaining that "[p]ersons, also, are divided by the law into either natural persons or artificial. Natural persons are such as the God of nature formed us. Artificial are such as are created by human laws for the purposes of society and government, which are called 'corporations' or 'bodies politic.'" Blackstone, *Commentaries* at 132. Early nineteenth-century case law reflected that distinction. *See, e.g., Louisville, Cincinnati & Charleston Railroad v. Letson*, 43 US (2 How) 497, 500 (1844) ("[W]hen a suit is brought in a Circuit Court of the United States, by or against a corporation, the court with reference to the question of jurisdiction, depending on the character of the parties, overlooks the artificial person,

the mere legal entity, which cannot be either citizen or alien, and regards only the natural persons of whom it is composed."); *Warner & Ray v. Beers*, 23 Wend 103 (NY 1840); *Thomas v. Dakin*, 22 Wend 9 (NY Sup Ct 1839) (describing "body corporate," the creation of which enables a number of persons to be concerned in accomplishing a particular object, "as one man"); *Wheeden v. The Camden and Amboy Railroad Company*, 1 Grant 420, 2 Phila 23 (1856) (when the word "citizen" was chosen by the constitutional framers, it was intended to mean a human being, not a corporation).

Thus, the framers of Oregon's remedy clause acted in a context that included other—arguably broader—formulations of the constitutional guarantee and that included as well a body of case law that drew an unambiguous distinction between natural and artificial persons. In that context, the conclusions that we have drawn from our analysis of the text—that is, that the remedy clause applies to natural, and not artificial, persons—makes sense. It is, we conclude, the only tenable conclusion.

3. *Oregon Case Law*

As we have noted, in addressing the question whether the remedy clause of Article I, section 10, applies to corporations, we confront a question of first impression. There is, however, one statement in *Smothers* that touched on the meaning of the term "man" as it is used in that clause. And it is on that statement that Liberty pins much of its argument in this case.

As we have noted, in *Smothers*, the court addressed the substantive nature of the guarantee contained in what has come to be known as the "remedy clause" of Article I, section 10. In its introductory comments concerning the text of the clause, the court in *Smothers* noted that the clause refers to the rights of every "man" to a remedy by due course of law. The court then stated, without any further analysis or comment, that, "[a]s applicable to modern circumstances, the phrase 'every man' means every person." 332 Or at 92.

Liberty seizes on the statement as support for its contention that the Oregon Constitution uses the words "man" and "person" interchangeably. It points out that the

court did not say "every *natural* person" and from that fact concludes that the court, at least implicitly, communicated that the remedy clause applies to artificial persons such as corporations.

In our view, Liberty reads more into *Smothers* than the case fairly can bear. In the first place, the court's comment was *dictum*; there was no issue in *Smothers* as to whether Article I, section 10, could protect Smothers, a man. Second, in context, it seems clear that the court merely intended to state that the term "man," as used in Article I, section 10, was intended in its gender-neutral sense, that is, to mean all human beings. As we noted in our textual analysis of the remedy clause, that is consistent with the ordinary meaning of the term as it was employed in the mid-nineteenth century. *See, e.g.*, Webster, *An American Dictionary* (defining "man" as, among other things, "the human race; the whole species of human beings"). It was also consistent with usage of the term in the law. *See, e.g., State v. Emery*, 224 NC 581, 594, 31 SE2d 858 (1944) ("The term [hominis] which we now translate as 'men' is a generic word, including both men and women."). Nothing in *Smothers* remotely suggests that the court intended to say more than that.

We therefore conclude that, based on an analysis of the text of the remedy clause in its context, as well as an analysis of the relevant historical circumstances and applicable case law, the clause applies to natural persons only. It does not afford any sort of guarantee to artificial entities such as corporations. In this case, there is no dispute that Liberty is an artificial, and not a natural, person. It necessarily follows that Liberty is not subject to the guarantee of the remedy clause of Article I, section 10.

Because we conclude that Liberty is not a "man" within the meaning of the Oregon remedy clause, we need not address OIGA's other contentions concerning the applicability of the remedy clause to this case.

Affirmed.